**Norman Carl HUG, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 15401.**

United States Court of Appeals
Sixth Circuit.

March 24, 1964.

476

Emanuel Shapiro, St. Louis, Mo., for appellant; Morris A. Shenker, Bernard J. Mellman, St. Louis, Mo., Jacques M. Schiffer, New York City, Hardy, Logan & Tross, Louisville, Ky., on brief.

William E. Scent, Louisville, Ky., and Stuart R. Pollak, Dept. of Justice, Washington, D. C., for appellee; Herbert J. Miller, Jr., Asst. Atty., General Criminal Div., Robert D. Peloquin, Edward F. Harrington, Stuart R. Pollak, Attys., Dept. of Justice, Washington, D. C., on brief.

Before CECIL and O'SULLIVAN, Circuit Judges, McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

Norman Carl Hug was convicted by a jury of perjury committed while testifying before a Grand Jury in the Western District of Kentucky. He appeals, claiming the conviction was based upon the testimony of only one person, which was not corroborated by any other witness or by circumstances inconsistent with his innocence. The government contends that the charge of perjury was sustained by the testimony of one witness, Arvel Decker; and that such testimony was corroborated by circumstances which were inconsistent with appellant's innocence. Testimony of one witness, so corroborated, is sufficient to sustain the conviction, under the rule announced in United States v. Wood, 14 Pet. 430, 39 U.S. 430, 439, 440, 10 L.Ed. 527. Other contentions will be reviewed in the course of this opinion.

The perjury charged against appellant Hug is set forth in the indictment to the effect that Hug appeared before a Grand Jury in the District Court for the Western District of Kentucky and testified as follows:

"Q. During the year 1961, did you give or turn over custody of $1,000 in cash to Arvel Decker at any place within the limits of the City of Louisville?

"A. No, Sir."

The government contends that such answer was false, and that Hug was, therefore, guilty of perjury.

At the time of the claimed perjury, the Grand Jury was conducting an investigation pertaining to possible violations in the Western District of Kentucky of Title 18 U.S.C.A. §§ 371 and 1001, and Title 29 U.S.C.A. §§ 501(c) and 439(c) and other federal criminal statutes. During the course of the investigation it became material that the Grand Jury should know and should be informed as to whether, among other matters, Stoy Decker, former president of Local 86 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, had used certain monies, in conducting his defense in certain criminal proceedings, that were transferred or given to him, in violation of Title 29 U.S.C.A. § 501.

The Grand Jury investigation covered a broad field involving the transfer of union funds contrary to the prohibition of various sections of the above-named statutes; and, in brief, the Grand Jury wanted to find out whether such funds were used for Stoy Decker's benefit and, if so, where they came from, and how they got to Stoy Decker. The government was not investigating Hug. It declared in open court that it had no information that the above-mentioned sum of $1,000 was stolen money, or that it was money illegally brought into the State of Kentucky, and stated it knew of no federal violation that could have been committed by appellant Hug in getting the money and transferring it to Arvel Decker, nor did any of the circumstances of appellant Hug's conduct in securing the money, or paying it over to Arvel Decker, provide a link in a chain of evidence which could incriminate Hug. The Grand Jury was occupied only with investigating the flow of money through various Teamster organizations to see whether there was any illegal use of funds.

On appeal, the evidence and all inferences to be drawn therefrom must be viewed in the light most favorable to the prevailing party and in support of the verdict. White Oak Coal Company, Inc. v. United Mine Workers of America, 318 F.2d 591 (C.A. 6).

It appears from the evidence that Stoy Decker, as above mentioned, was a former president of the Teamsters Local 86, and had been convicted in the District Court for the Western District of Kentucky on or about April 1, 1961, on an indictment charging him with embezzlement. After his conviction, he was free on bail, and his case was set for sentencing on April 12, 1961. The day before he was sentenced, and while he was still out on bail, on April 11, 1961, he needed $1,000, as he testified, "for the furtherance of my legal proceedings."

He testified that he then called James Hoffa in Washington, D. C., and told him that he needed $1,000. After speaking with Hoffa, Stoy Decker called the headquarters of Teamsters Local 89 in Louisville and talked to Marion Winstead, the secretary and treasurer of Teamsters Local 89. Stoy Decker stated that he requested Winstead to send someone to Chicago to Mr. Allen Dorfman's office on East Huron Street—that he needed to get someone to meet Mr. Dorfman at his office. He testified he had known Dorfman for five or six years and had had dealings with him in connection with Stoy's duties with Teamsters Local 86; that he had seen him at Teamsters' meetings, and had purchased a "legal fee" policy from him for $10,000, which is an insurance policy providing, supposedly, that if Stoy got into trouble, he could collect fees for lawyers and bonding fees up to the face amount of the policy. But the policy was cancelled after Stoy made a claim under it. Thereafter, Stoy made two or three trips to Chicago to see Dorfman about obtaining payment of a claim under the policy, but was unsuccessful in his efforts.

Stoy Decker was taken into custody about 6 P.M. on the evening of April 11, 1961, because of the denial by the Supreme Court of a writ of certiorari in another criminal case in which he had been appellant. He then called his brother, Arvel Decker, and told him to meet Norman Hug at the Federal Building in Louisville, "as I had proposed to have met him prior to my arrest."

On April 11, Stoy Decker's brother, Arvel Decker, a former member of Teamsters Local 89, testified that he communicated with appellant Hug and asked him if Hug was the man whom he was supposed to meet at a parking lot at 8th and Broadway in Louisville. Appellant Hug was assistant business agent of Teamsters Local 89. In reply to Arvel Decker's question, Hug told him that he would meet him the next day at a certain time at the parking lot. Arvel Decker had known Hug for five or six years. Hug had been associated with Stoy Deck-

er in Local 89, before Stoy Decker had become president of Local 86. According to appellant Hug's testimony, Arvel Decker called him by telephone before noon on April 11. Hug, himself, testified that Arvel Decker told him that Stoy Decker had talked to Arvel, and that Arvel wanted to talk to Hug about going to Chicago; that Hug then suggested that Arvel come out and talk about it; that Arvel did come to see him and told him that Stoy would like to have appellant Hug go to Chicago and see Allen Dorfman about some money. Hug testified that Arvel gave him the address of Dorfman in Chicago. Hug further testified that after this conversation, he bought a round-trip airline ticket to Chicago; that he flew to Chicago early in the morning of April 12. When he arrived in Chicago, Hug testified, he went to the office of Mr. Allen Dorfman on Huron Street. He testified that Arvel Decker had given him the address of Dorfman, and that he had never been in Dorfman's office before. However, he testified, as above mentioned, that he had been told to see Dorfman about the money. He said that he did not know Dorfman personally, but had been in Chicago on a number of other occasions at union meetings and had heard people talk about Dorfman, even to the extent that "they may have pointed him out." Hug further testified that he thereafter left Dorfman's office, and returned by plane to Louisville on April 12. Arvel Decker met him at the parking place that had been agreed upon as a rendezvous upon his return. When they met, Arvel testified, Hug gave him the $1,000 for Stoy Decker. Arvel testified that he suggested that he count the money in Hug's presence; and he did so. The amount of $1,000, Arvel said, was made up of twenty fifty-dollar bills. Hug stated that the reason he had gone to Chicago to get the money for Stoy Decker, was because he had worked with Stoy for six years, and because of his friendship for him. Arvel Decker had given Hug the cash necessary to buy the round-trip airline ticket to Chicago and return. Hug said that it did

not strike him as strange that Stoy Decker would call upon Hug to go to Chicago, rather than have his brother, Arvel Decker, make the trip to get the money.

Hug's claim, according to his testimony, is that when he arrived in Chicago, and went to Dorfman's office to see him and get the money, the man in charge of the office told him that Dorfman was out of town; that Hug then took the plane back to Louisville; that he saw Arvel Decker at the parking lot at the time they had agreed to meet; and that he told Arvel that Hug could not get the money because Dorfman was out of town.

The government proved that a check in the amount of $1,000, drawn on the personal account of Allen Dorfman, dated April 12, 1961, signed by Dorfman, and made payable to cash, was cashed by the Exchange National Bank of Chicago. The check was cashed shortly after the opening of the bank at 9 A.M. on April 12, 1961, on the morning of the day Hug had arrived in Chicago from Louisville, and had gone to Dorfman's office. The proofs showed that Dorfman's check for $1,000 was one of the first checks cashed that morning—in fact, the fourth check cashed that day, after the bank opened. There was no endorsement on the back of the check. A bank official, the auditor, testified that a check for $1,000, payable to cash, would be cashed by the bank, without endorsement of the person cashing it, if such individual were personally known at the bank. Hug was a complete stranger to the auditor, who had never seen him before the trial. Hug, of course, did not contend that he had ever been in the bank. Obviously, the bank did not pay $1,000 to Hug. Someone known personally to the paying teller—an individual other than Hug—presented the check for $1,000, signed by Dorfman, payable to cash; and the check was honored without requiring the person who presented the check to endorse it on the back. Hug had gone to Chicago, on behalf of Stoy Decker, to get the money from Dorfman. One of the questions in the case was whether Dorfman gave Hug the money for which Hug had made the special trip to Chicago.

On the afternoon of April 12, 1961, after Stoy had been taken to the District Court for sentencing, he saw his brother Arvel and, at that time, asked him whether he had the $1,000. Arvel told him he had just turned it over to Byrd, a bondsman, to whom Stoy was indebted in the amount of several thousand dollars. Byrd was in the courthouse and had intercepted Arvel a few minutes before he saw his brother Stoy. Arvel's delivery of the $1,000 to Byrd was a mistake, as Stoy had planned to use this money to file a petition for rehearing in the Supreme Court case, which had just been decided against him. Byrd testified in the instant case in the District Court and said that he had received $1,000 from Arvel at the courthouse just before Stoy was sentenced on the afternoon of April 12, 1961.

A year after Stoy Decker spoke to his brother Arvel, asking him whether he had the money, and after he had been sentenced in the District Court, Hug, accompanied by an attorney, Stanley Stratford, went to see him in the jail where he was serving his sentence. Stoy had asked that Hug come to the jail, or to have someone from the Union do so. In his conversation with Hug at that time, he told Hug what had happened to the $1,000. He explained why he needed money at that particular time; "that the thousand dollars that I had supposed to have gotten had been turned over to a bondsman by the name of Elmer Byrd and that I never got the money back"; and that he had never been able to utilize any of the money on his behalf in the case, as he had intended. Stoy Decker stated that Hug had expressed mild surprise. "Mr. Hug didn't say anything specifically, other than, 'I'll be darned,' or something of that nature." Hug agreed that he had been called to go down and see Stoy Decker at the jail "so I went down to see him. He [Stoy] mentioned a thousand dollar figure, and he said it went to the wrong person, or something or another, and I don't exactly

remember, but then I just couldn't understand, * * *" Hug stated, however, that he had said nothing further about the money when Stoy had told him that he had not received the $1,000.

Hug, as previously mentioned, denied before the Grand Jury that he gave the $1,000 to Arvel Decker on his return to Louisville from Chicago. The government claims that Hug's denial was false, and constituted perjury.

The government's accusation of perjury is supported by Arvel Decker's testimony that Hug gave him the money at the time and place above mentioned. The issue is whether Arvel Decker's testimony is corroborated by circumstances which are inconsistent with the innocence of appellant.

The first evidence the government found that Hug had made the trip by air from Louisville to Chicago on April 12, 1961, and had returned the same day, was during its investigation when it discovered the duplicate copies of tickets of the Eastern Air Lines, which, according to the carbon writing thereon, showed that they were issued to Hug for a round trip on the day and date in question.

These duplicate copies of the airline tickets were found by agents of the F.B.I. when they made an examination of the records of Teamsters Local 89. The duplicate tickets were attached to other documents which Hug had filed in accounting for his expenditures on a subsequent trip on union business to Minneapolis. There was no reason for Hug to file the duplicate copies of the round-trip tickets to Chicago. Hug testified that he paid for the airline tickets with cash that had been given to him for this purpose by Arvel Decker; and this testimony is undisputed. The filing of the duplicate tickets, in the nature of a receipt for such "cash paid" tickets, with the Local of the Union, must have resulted from a mistake. Union funds had not been paid out for the ticket; and, as above mentioned, there would be no need for the filing of such a duplicate ticket receipt, or any accounting for the cash paid out by Arvel Decker to Hug on a private matter.

Hug, perhaps unwittingly, attached these duplicate tickets to Chicago and return to the documents which he filed later for his expenditures for the trip to Minnesota.

Apparently, Hug did not know what had happened to the duplicate carbon copies of the airline tickets to Chicago, until the F.B.I. found them among the records of Teamsters Local 89.

When Hug was asked before the Grand Jury whether he had made a trip from Louisville to Chicago on April 12, 1961, and had returned the same day, he said he could not remember. He was asked several times about the alleged incident and each time he repeated that he could not recall it. He was shown the duplicate of the Eastern Air Lines ticket from Louisville to Chicago and return to Louisville. The duplicate of the ticket showed that it was made out to Hug; and the time stamp on the ticket was April 11. Hug cast doubt upon the identity of this duplicate. He said he did not know that it was an exact duplicate of the original ticket, "or what it is." He testified that it did not refresh his recollection as to any trip he had made to Chicago on April 12, 1961, or any trip he had made at any time in April 1961. The fact that the duplicate, or duplicates, of the airline ticket, which were shown to Hug before the Grand Jury, were carbon copies, might have raised doubts as to whether they might have been used by him. They were somewhat smudged, and had no notation on them of the date when they were actually used. The point is that Hug, before the Grand Jury, was casting doubt on the authenticity of the duplicate copies of the ticket, and refused to admit he had made the trip from Louisville to Chicago on April 12, 1961, to see Dorfman. He claimed he had no memory of making such a trip, and had no knowledge of what the duplicate ticket was.

However, after Hug's testimony before the Grand Jury, and two months later, at the time of the trial of this case, the government had been able to secure the

original airline tickets used by Hug on the round trip from Louisville to Chicago and return on April 12, 1961. The government secured these original tickets by virtue of a subpoena, issued two days before the commencement of the trial, directed to Charles J. Powers of Miami, Florida, Supervisor of the Passenger Statistics Section of Eastern Air Lines, and in charge of its passenger files.

These original tickets secured by virtue of the subpoena had a stamp upon them which did not appear upon the duplicate copies. The stamp on one of the tickets was: "Used 188 Apr 12"; and the other: "Used 169 Apr 12." "188" designated the flight from Louisville to Chicago; "169" designated the return trip from Chicago to Louisville. When these original tickets were shown to Hug during his cross-examination on the trial of this case, he then identified them as the original tickets issued to him, and readily, and for the first time, admitted that he had made a trip by Eastern Air Lines from Louisville to Chicago on April 12, 1961, and had returned by Eastern Air Lines to Louisville the same day. The original tickets showed the flights he had taken according to Eastern Air Lines' symbols; and the records of Eastern Air Lines showed that Hug had left the Louisville terminal at 7:20 A.M., and had arrived at the Chicago Midway terminal at 8:17 A.M. on April 12, 1961. The records further disclosed that Hug had left the Chicago Midway terminal at 11:15 A.M. and had arrived in Louisville on the same day at 1:11 P.M.

We are of the opinion that Arvel Decker's testimony that Hug had given him $1,000 in cash during 1961, within the limits of the City of Louisville, was corroborated by circumstances that were inconsistent with Hug's testimony before the Grand Jury that he had not given Arvel the money at the time and place mentioned.

These circumstances which the jury could have found to be corroborative of Arvel Decker's testimony are the following:

Stoy Decker had called Hoffa in Washington and told him he needed $1,000. Stoy thereafter had his brother Arvel get in touch with Hug of the Local Teamsters Union in order to ask Hug to go to Chicago and see Dorfman, and get the money Stoy had asked for. Arvel Decker talked with Hug about going to Chicago and getting the money from Dorfman and gave him Dorfman's address in Chicago. Hug admitted that he told Arvel Decker that he would go to Chicago the next day, on April 12, 1961, and see Dorfman, in order to get the money for Stoy Decker. Arvel gave Hug the money to make the trip. Hug left Louisville at 7:20 A.M. on April 12, 1961, and arrived at the Chicago airport at 8:17 A.M. He went immediately to Dorfman's office. On April 12, 1961, shortly after the bank opened, a check written out in longhand and signed by Allen Dorfman, dated April 12, 1961, and made payable to "Cash" was cashed by the bank without endorsement. The bank cashed unendorsed checks payable to "Cash" if the person presenting the check was known to the teller. Hug did not cash the check. He was unknown to the bank. At 11:15 A.M. Hug took the return flight from Chicago to Louisville and arrived in Louisville at 1:11 P.M. Hug then saw Arvel Decker at a prearranged place in Louisville, about an hour before Stoy was to be sentenced in District Court.

Hug was in Chicago when Dorfman's check for $1,000, made out to "Cash," was paid by the bank. Was Dorfman in Chicago at the time? Hug stated that the man in charge of Dorfman's office told him that he was out of the city, and that he did not see Dorfman or receive any money from him. But Dorfman's check, made out in his handwriting and signed by him, was dated April 12, 1961. The jury could have drawn an inference, under the circumstances, that Dorfman was in Chicago on the day the check was dated and signed by him.

Did Hug receive $1,000 from Dorfman on the morning of April 12, 1961? The check, payable to "Cash," was made out in the amount of $1,000. This was the

exact amount that Stoy Decker called Hoffa about and that he wanted to get from Dorfman in Chicago; and Hug had made the trip to Chicago solely to get the requested money from Dorfman on behalf of Stoy Decker. The check for $1,000 was paid in cash by the bank after Hug arrived in Chicago on April 12, 1961, and after he had gone to Dorfman's office to get the money for Stoy Decker. After being in Dorfman's office that morning, and after the check for $1,000 was cashed, Hug immediately returned to Louisville.

From these facts the jury could have concluded that Hug received $1,000 in Chicago on April 12, 1961, and that he brought this money back to Louisville and gave it to Arvel Decker on the same day at a prearranged place of meeting and in consummation of the purpose for which Hug went to Chicago; and that the testimony of Arvel Decker that he received $1,000 from Hug on April 12, 1961, was corroborated by the above-mentioned circumstances.

■ Moreover, Hug refused to admit before the Grand Jury that he had made the trip to Chicago on April 12, 1961. As has been said, he testified before the Grand Jury that he could recall no such trip; that he could not identify the duplicate copies of the airline tickets he had used; and, when questioned about such duplicate copies of the airline tickets, he testified he did not know what they were. However, when the original tickets he used for the trip were found in the Miami office of the Eastern Air Lines two years after he had made the trip to Chicago, Hug identified them and readily admitted he had made the round trip to Chicago on April 12, 1961. Why did he refuse to admit that he made this trip when questioned before the Grand Jury? Why did he say he could not recall any such trip? How could he fail to have any recollection whatever of this unusual trip which he made from Louisville to Chicago and from Chicago to Louisville during the morning of April 12, 1961, even when shown the duplicate copies of the airline tickets, when, admittedly, he made the

trip to get money for Stoy Decker? How could he suddenly recall the trip to Chicago, the visit to Dorfman's office, the return trip to Louisville, and his meeting there with Arvel Decker on the same day at a prearranged place of meeting—just as soon as the government produced the original airline tickets bearing his name and showing that they had been used on April 12, 1961? The jury could draw inferences from the foregoing facts that Hug wanted to hamper the government as much as he could in its investigation as to whether he made the trip; to cast doubt on the authenticity of the duplicate copies of the airline tickets and prevent the government from placing him in Chicago on the day he was alleged to have received the $1,000; and that when the incontrovertible evidence of the original tickets was presented, Hug was then obliged to admit he had made the trip. From these circumstances, the jury could draw an inference that Hug had tried to prevent the government from proving he had gone to Chicago on April 12, 1961; that Hug's conduct in this regard was because of some particular and important reason; and that that reason was to cover up the fact that he had received $1,000 in Chicago, which he had given to Arvel Decker on his return to Louisville.

■ Appellant further contends that the admission of hearsay testimony was prejudicial error. This alleged hearsay was concerned principally with the testimony of Stoy Decker regarding what he said to various persons in telephone conversations; and it is claimed by appellant that such testimony was inadmissible to show that Hug had made the trip in question from Louisville to Chicago and return on April 12, 1961. Stoy Decker testified, however, only to what he had said and did not relate the conversations. In any event, all objection became moot when Hug afterward admitted in his testimony that he had made the trip on the day in question. Erroneous admission of evidence is harmless, where the opposite party testifies to the same facts as shown by the objectionable evidence. The opening statement of government

counsel to the jury is complained of because it was stated therein that the evidence would show what Stoy Decker said to Hoffa and Winstead in telephone conversations and what they said to Decker about going to Chicago for the purpose of getting money from Dorfman. However, once appellant Hug admitted making the trip to Chicago on April 12, 1961, to see Dorfman in order to get money for Stoy Decker, the fact that government counsel, in his opening statement to the jury, said that the telephone conversations of Stoy Decker with Hoffa and Winstead showed what they said to Decker and proved the purpose of the trip, would not constitute prejudicial reversible error. The alleged statements of Hoffa and Winstead in the telephone conversations with Stoy Decker, referred to by government counsel in his opening statement, related only to showing that appellant went to Chicago on the day in question for the purpose of securing money for Stoy Decker. Appellant's later admission that he did make the trip for this purpose eradicated any possible harm or prejudice to appellant in the opening statement.

On cross-examination by appellant's counsel, Arvel Decker denied that he had once stolen a case of bacon from his employer. He testified that he had been stopped by a private detective while delivering food products for his employer; that the incident involved a case of bacon which Arvel Decker had been carrying in the food truck; that the detective brought the case of bacon to his employer; that Arvel protested at the time that he was innocent of the charge of stealing, but that his employer immediately discharged him. During the long cross-examination, Arvel Decker repeatedly denied that he had ever stolen anything and stated that he had never been arrested for any such theft.

 After Arvel Decker's testimony, appellant's counsel called a private detective to impeach his credibility in an effort to show that he had been discharged for stealing. The trial court sustained the opposition of government counsel to such testimony. Counsel for appellant then asked the court if he could question a witness to show that Arvel Decker was "fired." The court ruled that counsel could not introduce any additional evidence on this point, and that they would never get through the trial if such type of evidence were permitted. We find no error in the court's ruling. Arvel Decker's testimony, in spite of combined admissions and denials, was to the effect that he was discharged because of the incident of the case of bacon, and that, in spite of his protest that he was innocent of the charge of stealing, he was "fired immediately." Counsel for appellant was able to get into the record everything that was permissible with regard to the incident, and appellant was not prejudiced merely because the testimony concerning the incident was not repeated by other witnesses. Moreover, when a witness is cross-examined for the purpose of discrediting his veracity by proof of specific acts of misconduct not the subject of a conviction, the cross-examiner must take his answer as it is given and is not free to bring in independent proof to show that the answer was untrue. "While the scope of the cross-examination of the witness concerning prior misconduct not the subject of conviction is, in its administration, within the sound discretion of the trial judge, the same principle is not applicable to rebuttal testimony which is inadmissible." United States v. Sweeney, 262 F.2d 272, 277 (C.A. 3). There is a limit to the admission of testimony going to the impeachment of a witness. The extent of cross-examination of a witness, for the purpose of discrediting him, is a matter resting largely in the discretion of the trial court especially as to specific acts of misconduct.

Counsel for appellant contends that the trial court acted improperly in allowing the government to impeach appellant by inquiry into matters not involving conviction of a crime, and by bringing in a third party to testify regarding such matter. This contention arises out

of cross-examination of appellant with regard to a document found in the sheaf of papers discovered by the F.B.I. among the records of Teamsters Local 89. The document in question purported to be a bill from a motel which appellant Hug had paid in the course of his business trip to Minnesota on behalf of Local 89. The bill appeared to indicate that Hug had paid the motel the sum of $54.45 for his room and charges. However, the amount set forth in the handwritten bill appeared as though it might have been changed from $24.45 to $54.45. When appellant was asked to explain how he figured out trip expense reports to Minnesota, his counsel objected on the ground that it had nothing to do with the issues before the court. After considerable cross-examination on the method of making such reports, appellant was asked whether he had spent the amount of $54.-45 at the motel in question on that particular trip. Appellant's reply was that he assumed so, "if they gave this receipt." He was then asked whether he recalled "lifting it" from $24 to $54. He said that he did not recall; that he did not know whether the "5" in the amount of the bill was the normal figure he made or not; that he assumed he paid $54.45 for the motel bill because that is what the receipt stated. He further testified that the figures did not look as though they had been "fiddled with" and he did not know whether the ink was the same in one of the numerals as in another. Counsel for the government then declared that he would like "to run a little experiment" with the witness. Appellant's counsel objected, stating: "What has that got to do now with the issue before you in this case concerning a thousand dollars in the City of Louisville which this witness is supposed to have given to Arvel Decker?" The court then observed that he assumed it went to the credibility of the witness. At this point appellant's counsel declared:

"Well, it's not the best evidence, Your Honor, at this point. He's had enough time to check with the hotel. If he says someone has falsified an account here, he's had enough time to bring in the best evidence and have—"

Counsel for the government replied:

"All right. Your Honor, Mr. Schiffer has demanded that we bring in the best evidence. Could we excuse this witness and call another witness for the evidence rule?"

Counsel did not object to the calling of a witness to testify as to the receipt given by the motel. Miss Kay King then took the stand and stated that she was manager of the motel and that her original records showed that the amount paid by appellant to the motel for the services at the time in question was $24.45; that she did not think the ink of the numeral "5" was the same ink as that of the other numerals and the other writing in her own hand; that she did not write the "5" in the $54.45; and that the true bill rendered was $24.45. All of this testimony of Miss King was introduced without any objection by appellant's counsel. Subsequently, appellant stated that he could not recall changing the "2" to a "5," but that if he did change the amount from $24.45 to $54.45, after the bill in the amount of $24.45 had been marked "Paid" by Miss King, it would include other meals and tips for which he had not furnished separate statements to Local 89, when he filed his expense account.

■■ The accused in a criminal proceeding who takes the stand is subject to the same kind of cross-examination as any other witness. "It is argued that because the defendant was on trial he was not subject to impeachment by cross-examination as to other offenses like an ordinary witness. It is well settled, however, that where a defendant elects to make himself a witness he may be cross-examined as such." Simon v. United States, 123 F.2d 80, 85 (C.A. 4). We are of the view that in this case the conduct of the accused with reference to the receipted bill could properly be shown since it was pertinent to the credibility of the witness. Moreover, no objection was

made by appellant's counsel to the testimony of Miss King as to the alteration of her handwritten receipt. Instead of any objection having been made to Miss King's testimony, it was rather invited when counsel for appellant stated that government counsel had had enough time to check with the hotel and that if he stated someone had falsified an account, he had enough time to bring in the best evidence. Miss King's testimony was the best evidence. We find no prejudicial reversible error in the cross-examination of appellant Hug or in the introduction of Miss King's testimony.

■ Appellant contends that the District Court erroneously ordered Hug to answer a question that incriminated him before the Grand Jury, and that the court was led into making its order because of the misrepresentation of the government that such answer would not incriminate Hug. It is claimed that as a result of its misrepresentation to the court, the government is guilty of entrapping Hug into committing the perjury for which he was convicted.

Hug was not incriminated by answering the question which the court directed. The government explicitly stated, before he gave his answer, that it knew of no unlawful conduct of Hug and that his answer as to whether he made a trip to Chicago or paid the money to Arvel Decker would not be used as a link in any chain of evidence leading to an indictment. No one ever suggested that Hug was guilty of any unlawful act before he appeared before the Grand Jury or until he gave the answer before the Grand Jury, which led to his conviction for perjury in this case. There is no substance to appellant's contention of the government's misrepresentation and entrapment.

■ Appellant claims he was prejudiced by the statement in the closing argument of government counsel that appellant could have called Dorfman as a witness in the case. But this statement was made in reply to the prior argument of appellant's counsel that it was signifi-cant that the government could have called Dorfman as a witness and failed to do so, and that the government knew Dorfman would have testified against the government if he had been a witness.

Dorfman was equally available as a witness to appellant and to the government. Under the circumstances, we see no prejudicial reversible error in the statement of government counsel which was made in answer to the argument of appellant's counsel. Other claims of error are without merit.

In accordance with the foregoing, the judgment of the District Court is affirmed.