802 F.2d 460
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee
v.
ROBERT R. DANIEL, Defendant-Appellant.
 No. 85-5814.
 United States Court of Appeals, Sixth Circuit.
 Aug. 8, 1986.
 
 BEFORE: LIVELY, WELLFORD, and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant Robert R. Daniel appeals from his conviction on seven of the eight counts charged against him, including one count of conducting an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. Sec. 1962(c). The RICO count and the others, including conspiracy charges, involved arsons and solicitation of arson and concerned use of mails and interstate commerce.
 
 
 2
 Daniel was indicted along with codefendants Robert Winfred Call and Rodney Dean Davis. The first count of the indictment, the RICO count, charged Daniel with conducting an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. Sec. 1962(c), and alleged five predicate acts: two separate acts of conducting an illegal gambling business, in violation of 18 U.S.C. Sec. 1955; one act of arsonrelated mail fraud in violation of Tenn. Code Ann. Sec. 39-3-302 (1982) and 18 U.S.C. Sec. 1341; one act of solicitation to commit arson in violation of Tenn. Code Ann. Sec. 39-3-202 (1982); and one act of soliciting to commit the first degree murder of Tennessee District Attorney General Jim Horner in violation of Tenn. Code Ann. Sec. 39-1-401 (1982). The remaining counts of the indictment charged Daniel as follows:
 
 
 3
 COUNT 2: Arson-related mail fraud, in violation of 18 U.S.C. Sec. 1341, in connection with the burning of a mobile home belonging to Daniel's girlfriend.
 
 
 4
 COUNT 3: Conspiracy to commit arson involving the "Grand Central Station" nightclub, in violation of 18 U.S.C. Sec. 371.
 
 
 5
 COUNT 4: Arson involving the Grand Central Station nightclub, in violation of 18 U.S.C. Sec. 844(i).
 
 
 6
 COUNT 5: Arson-related mail fraud, in violation of 18 U.S.C. Sec. 1341, in connection with the burning of the Grand Central Station nightclub.
 
 
 7
 COUNT 6: Conducting an illegal gambling business in violation of 18 U.S.C. Sec. 1955.
 
 
 8
 COUNT 7: Conspiracy to commit arson involving "The Store", in violation of 18 U.S.C. Sec. 371.
 
 
 9
 COUNT 8: Solicitation of another to commit arson involving The Store, in violation of 18 U.S.C. Sec. 373.
 
 
 10
 Defendant filed a motion to suppress evidence, alleging lack of probable cause to support a warrant for a search of Daniel's office. The district court denied the motion as well as other motions concerning Miranda warnings in respect to a statement or statements given the law enforcement officers and the propriety of intercepting his phone conversations with a police informant. A change of venue motion was also overruled.
 
 
 11
 On April 29, 1985, the jury returned a verdict of guilty on all counts but Count 2 (arson-related mail fraud). As to Count 1, the RICO count, the jury found that the defendant had committed all five charged predicate acts. Defendant Daniel was sentenced to 13 years imprisonment and ordered to forfeit his interest in Volunteer Amusement Company, a company which distributed gaming machines in the area and owned by Daniel as a sole proprietor, in Dyersburg, Tennessee. The defendant employed from 7 to 10 people during 1982 and through September 1983. Daniel, through Volunteer Amusement Company, placed amusement or gaming machines (video and pinball machines, pool tables, and other types) in numerous establishments in Dyer County, Tennessee. Employees of Volunteer Amusement Company collected the proceeds from the machines, reimbursed the operators for any pay-outs, and split the net proceeds with the owner. Persons playing the machines and devices would deposit money to play and if they won, they would receive "credits" which the player could "cash in." For example, one witness testified that for a $10 investment, she won and received $100 on the Volunteer Amusement Company machine. The operators indicated that their pay-outs to customers or players were reimbursed by Volunteer Amusement Company.
 
 
 12
 Undercover law enforcement agents, investigating Daniel's operations, went into approximately 40 establishments and played the machines. In all but one instance, the establishments paid out money for winning credits on the poker machines. Thereafter, the Tennessee Bureau of Investigation raided all the establishments in which pay-offs on the machines had been made. One hundred and seven machines were seized, of which 95 to 97 machines belonged to the defendant, Robert Daniel.
 
 
 13
 A nightclub in Dyersburg, Tennessee, "Grand Central Station," was located almost directly in front of the business offices of Volunteer Amusement Company. The club stocked and served beer which had been brewed and brought in from outside Tennessee. The building in which "Grand Central Station" was located was owned by Danny Jones but was leased to Calvin Hollis. In order to equip and operate this nightclub, Hollis had borrowed $1,000 from Daniel and pledged his car as security. Located only a few feet behind this nightclub, Daniel owned a metal storage building which was used to store old machines and parts. On May 4, 1984, the "Grand Central Station" burned to the ground and caused heavy damage to the metal storage building and its contents. Arson investigators called to the scene concluded that arson was involved. A sample of debris from the scene was found to contain gasoline. As a result of the damage to the contents of the metal storage building, the defendant Daniel filed an insurance claim involving the use of the mails.
 
 
 14
 Some months after the raids, defendant began putting his machines back into various establishments. Terry Burns, the routeman who collected money from the machines, stated that the establishments were still paying off on the machines just as they had before, and that Volunteer Amusement Company was still reimbursing the pay-outs and splitting the proceeds with the establishments. Burns further stated, however, that the defendant told him to caution the establishment owners about paying-out to anybody they did not know.
 
 
 15
 Rodney Davis, a former Dyersburg police officer, was arrested and confronted with taped admissions of involvement in criminal activities. Davis had previously pleaded guilty to a bank robbery, and had been sentenced to six years before being granted parole in October 1984. While incarcerated, Davis spent much of his time at the Dyer County Sheriff's residence performing various personal services. He came into contact with defendant Daniel, who, according to Davis' admission, hired Call and him to burn "Grand Central Station." Daniel pointed to his metal storage building next to "Grand Central Station" and directed that the metal storage building also be burned and its contents destroyed, describing the contents of the storage building as junk. Daniel told David that he could file insurance claims on the contents of his metal building.
 
 
 16
 Davis said he conferred with two other Dyersburg policemen who had also been involed in criminal activity for advice about the planned arson. He hoped that these officers would cover up for him if necessary. Davis stated that Daniel gave him $100 and that Call had given him $250 after the arson.
 
 
 17
 After Davis was paroled in October 1984, Daniel contacted him about burning a business known as "The Store," operated by Daniel's son, which stocked and sold a high volume from outside Tennessee. Daniel related that his son's business was losing money, thereby consting Daniel money. He accordingly wanted the contents burned so he could collect the insurance; Davis agreed to burn "The Store" for a price.
 
 
 18
 Davis further testified that shortly before his parole, Daniel offered him $10,000 or a truck, whichever he wanted, to kill Dyer County District Attorney General Jim Horner. In November 1984, Davis had conversed with Johnny West about this offer, but West had been equipped with a hidden recording device by TBI agents. In this conversation Davis made admissions about his part in the burning of the "Grand Central Station," a plot to kill District Attorney General Jim Horner, and other crimes. When confronted with the tape, Davis admitted his involvement, gave a complete statement and agreed to cooperate with the government.
 
 
 19
 In December of 1984, Davis himself was equipped with a hidden tape recorder and transmitter before meetings with Daniel. The taped recordings of these conversations evidenced both parties' part in burning "The Store." They also discussed on tape the plot to kill Horner. Daniel considered the possibility of merely intimidating Horner, but indicated to Davis that he still wanted to have Horner killed.
 
 
 20
 Davis also recorded conservations with defendant Call in which they discussed arsons for Daniel. After Sheriff Tommy Cribbs informed Daniel about hearing rumors that Davis was working for the government, Davis could no longer be used to record conversations.
 
 
 21
 In December of 1984, law enforcement agents confronted Call about these criminal activities with Davis and Daniel. Call admitted his involvement, gave a full statement and also agreed to cooperate in the continuing investigation. Call also admitted that he had been asked by Daniel to make a silencer to fit a specific weapon furnished by Daniel that would be used to kill District Attorney Horner. Call turned the silencer and rifle over to a law enforcement officer.
 
 
 22
 Call admitted to the agents and testified at trial that he and Davis burned the "Grand Central Station" at Daniel's direction in such a fashion that Daniel's storage building would also be burned. Call confirmed that Daniel wanted to file an insurance claim on the old machines inside. Call also admitted being paid by Daniel for both arsons with Davis, and confirming details of these criminal activities.
 
 
 23
 Call also agreed to wear a hidden tape recorder and transmitter while talking with Daniel. The taped conversations included discussions of rumors that Davis was working for the government and discussions of the plot to kill District Attorney Horner. Call and Daniel also discussed the necessity of not testifying against one another if caught, so that it would be their "word" against that of Davis, a convicted felon.
 
 
 24
 Daniel appeals from a denial of a change in venue, from the overruling of his motion to suppress, from admission of his oral statement to police, from the replaying of parts of his taped conversations to the jury, from certain other evidentiary rulings and from what he claims to be an excessive sentence.
 
 I.
 
 25
 WAS THERE ABUSE OF DISCRETION IN DENYING A CHANGE OF VENUE?
 
 
 26
 At the hearing on defendant's motion, Daniel introduced copies of various newspaper articles from Memphis and Dyer County newspapers from January 1985 through March 1985. He also introduced a videotaped composite of television news stories from the same time period, which covered extensive and varied allegations of criminal wrongdoing, particularly involving Dyer County Sheriff Tommy Cribbs but also concerning defendant Daniel. As the district court noted:
 
 
 27
 [t]he primary thrust of the motion was based upon the rash of unfavorable publicity surrounding the arrest and prosecution of Sheriff Tommy Cribbs . . . because the defendant Daniel "has been portrayed throughout the media as a friend and cohort of Sheriff Cribbs" and the name of Sheriff Cribbs would surface during the trial of defendant Daniel.
 
 
 28
 The district court denied defendant's motion for a change of venue, but stated that it would reconsider the motion if it later appeared that a fair jury could not be chosen at the trial in Memphis. The district court did, however, grant "individual and sequestered voir dire of all jurors in regard to their exposure and influence by the pretrial publicity," and granted counsel permission to participate in voir dire on the matter of pretrial publicity, and "directed those parties [the parties, counsel, law enforcement personnel participating in the trial, and court personnel] not to discuss the case with the news media during the trial."
 
 
 29
 The district court has wide discretion in determining whether to grant a change of venue, Graham v. United States, 257 F.2d 724, 730 (6th Cir. 1958). As the government points out, the ultimate question is whether it is possible to select a fair and impartial jury. See United States v. McNally, 485 F.2d 398 (8th Cir. 1973), cert. denied, 415 U.S. 978 (1974). For a defendant to be entitled to a change of venue, he must show that "there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district." Fed. R. Crim. P. 21(a). See 8A J. Moore, Moore's Federal Practice P 21.03- (2d ed. 1986); Brofford v. Marshall, 751 F.2d 845 (6th Cir. 1985).
 
 
 30
 We find no abuse of discretion in the district court's careful approach to defendant's motion for change of venue.
 
 II.
 
 31
 WAS IT ERROR TO DENY DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF A SEARCH WARRANT?
 
 
 32
 Defendant argues that the search warrants executed by government agents at Daniel's home near Dyersburg and at his business in Dyersburg were not supported by probable cause. The district court rejected this argument and denied defendant's motion to suppress. Defendant claims that none of the affiants on whose statements the search warrants issued "ever stated that they knew any records were in his [defendant's] home or business or that they had seen them," and that "the search was a fishing expedition."
 
 
 33
 The appropriate standard of review in this situation was established in Illinois v. Gates, 462 U.S. 213 (1983). In deciding whethan informant's tip establishes probable cause for issuance of a warrant, the "totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations" is to be applied. Id. at 238.
 
 
 34
 The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed. Jones v. United States, 362 U.S. at 271.
 
 
 35
 Id. at 238-39. Reviewing courts are not to undertake a de novo review of the probable cause determination, but are to pay it "great deference." Id. at 236.
 
 
 36
 We conclude that there was a substantial basis for deciding that probable cause existed, both as to the search of the residence and of the business.
 
 III.
 
 37
 WAS IT ERROR NOT TO SUPPRESS DEFENDANT'S STATEMENTS AFTER HIS ARREST AND TO ADMIT TAPED CONVERSATIONS BETWEEN DANIEL AND HIS CODEFENDANTS?
 
 
 38
 The district court found the agents' testimony "clearly" to establish that Miranda warnings were given to defendant and that "[t]here was no indication that the statements were at all involuntary." Daniel's statement concerning ownership of certain firearms, however, was "not used in the course of this trial." The trial court did not err in overruling the motion to suppress Daniel's statements after arrest in any event.
 
 
 39
 Defendant also argues that the tape recordings of conversations with codefendants Davis and Call should have been suppressed on the ground that their consent was not properly obtained as required by 18 U.S.C. Sec. 2511(2)(c). The district court denied defendant's contention, holding "there was nothing to indicate that they were threatened, coerced or otherwise persuaded to participate on an involuntary basis," in granting permission for the taping of the conversations and in their cooperating with the prosecution of Daniel.
 
 
 40
 Again, we find no error in the district court's ruling to this effect. We have repeatedly held that promises of leniency or assistance to informants or conconspirators in return for their cooperation in recording conversations do not render their consent involuntary or coerced and thus invalid under Sec. 2511(2)(c). See United States v. Scaife, 749 F.2d 338, 345 (6th Cir. 1984); United States v. Hodge, 539 F.2d 898, 904-95 (6th Cir. 1976), cert. denied, 429 U.S. 1091 (1977); United States v. Franks, 511 F.2d 25, 30-31 (6th Cir.), cert. denied, 422 U.S. 1042 (1975).
 
 IV.
 
 41
 WAS THERE ERROR IN LIMITING CROSS-EXAMINATION AND EXCLUDING EXTRINSIC EVIDENCE OF THE CREDIBILITY OF GOVERNMENT WITNESSES UNDER FED. R. EVID. 608(b)?
 
 
 42
 Defendant asserts that the district court erred in not allowing (1) cross-examination of Call concerning two instances of offering to sell the sexual favors of his wife, and (2) proof from other witnesses that would contradict testimony of Davis and Call as to prior bad acts on their part. The defendant asserts that the purpose to which this extrinsic evidence was directed was to impeach the credibility of Call and Davis. The district court excluded this testimony on grounds of Fed. R. Evid. 608(b).[1] With respect to the testimony of witnesses other than Davis and Call, Rule 608(b), which is based squarely upon the common law, expressly forbids the admission of such "extrinsic evidence." See Hug v. United States, 329 F.2d 475, 483 (6th Cir.), cert. denied, 379 U.S. 818 (1964). Much of the testimony defendant sought to contradict with extrinsic evidence was actually irrelevant to the witness's "character for truthfulness or untruthfulness."
 
 
 43
 The limitation on the cross-examination of Call involved the alleged sale of his wife's sexual favors, a peripheral and immaterial aspect of his character for truthfulness or untruthfulness, with reference to Rule 608(b)(1).
 
 
 44
 We find no reversible error in these rulings made by the district court.
 
 V.
 
 45
 WAS THERE ABUSE OF DISCRETION IN REPLAYING TAPE RECORDINGS AT THE JURY'S REQUEST DURING ITS DELIBERATIONS?
 
 
 46
 Defendant argues that the district court erred in acceding to the jury's request during its deliberations to hear replayed two tape recordings played and introduced into evidence during the trial. In United States v. Scaife, 749 F.2d 338, 346-47 (6th Cir. 1984) (Contie, J.), we found no abuse of the district court's broad discretion where the district court granted the jury's request during its deliberations to have tape recordings of conversations between the defendants and government informants sent to the jury room. We noted the district court's "broad discretion to permit a jury to take to the jury room any tape recordings that have been admitted as exhibits during trial. See United States v. Sims, 719 F.2d 375, 379 (11th Cir. 1983), cert. denied, 104 S. Ct. 1304 (1984); United States v. Samples, 713 F.2d 298, 303 (7th Cir. 1983)." 749 F.2d at 347. Accordingly, there was no error in the district court's actions in this case.
 
 VI.
 OTHER ASSIGNED ERRORS
 
 47
 Defendant makes a perfunctory argument in his brief on appeal that no reasonble juror could find defendant guilty beyond a reasonable doubt. We have recited at some length evidence that a reasonable jury might well believe defendant's involvement and participation in the offenses charged. There is no basis for this contention.
 
 
 48
 Finally, we address the argument that the sentence is excessive. Given the broad discretion afforded the district court in sentencing and the circumstances involved in the crimes, we are not disposed to disturb the sentencing judge's disposition, even if we had the authority to do so. See United States v. De Bardeleban, 740 F.2d 440 (6th Cir.), cert. denied, 105 S. Ct. 448 (1984).
 
 CONCLUSION
 
 49
 We AFFIRM the defendant's conviction in all respects.
 
 
 
 [1]
 Rule 608(b) provides:
 b. Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.