**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Mitchell DeBARDELEBEN, Defendant-Appellant.**

**No. 83–5678.**

United States Court of Appeals, Sixth Circuit.

Argued May 8, 1984.

Decided July 27, 1984.

Certiorari Denied Nov. 13, 1984. See 105 S.Ct. 448.

James A.H. Bell (argued), Knoxville, Tenn., for defendant-appellant.

John W. Gill, Jr., U.S. Atty., Charles Fels, Asst. U.S. Atty. (argued), Knoxville, Tenn., for plaintiff-appellee.

Before KENNEDY and WELLFORD, Circuit Judges, and COHN, District Judge.*

---

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

WELLFORD, Circuit Judge.

Defendant, James DeBardeleben, appeals his conviction by the trial judge for counterfeiting and carrying a firearm during the commission of that offense in violation of 18 U.S.C. § 472 and § 924(c)(2), respectively. The trial court, after defendant had waived a jury trial, sentenced defendant to fifteen years on each of the six counts of counterfeiting, to run concurrently, and to a five year sentence on the firearm charge, to run consecutively with the fifteen year sentence.

The primary issue raised by defendant on this appeal is whether the trial court erred in denying defendant's motion to suppress evidence obtained under a warrant. The validity of this search warrant depends on the validity of the actions of a Secret Service agent in checking whether a set of car keys lawfully found in defendant's possession after his arrest would fit the door and trunk locks of a car found in a parking lot and suspected to belong to defendant.

The trial court found that the "mere testing of whether defendant's keys would unlock and lock an automobile" was not a search within the meaning of the Fourth Amendment because defendant had no reasonable expectation of privacy in the testing of the car keys in the locks. Under the circumstances of this case, which clearly indicate that law enforcement officials followed proper procedure in every respect, we affirm.

On May 25, 1983, Secret Service Agent Jones Allison warned local merchants at shopping malls in Knoxville and Maryville, Tennessee, that a white male dubbed the "Mall Passer" might attempt to pass counterfeit $20 bills as he had done at two shopping centers in Kingsport and Johnson City, also located in the east Tennessee area. Allison distributed a composite drawing of an individual the Secret Service believed on the basis of past reports to be the "Mall Passer." That same day employees of Walden Book Store at the Maryville Mall, Donna Meador and Denise Clegg, recognized defendant as likely being the individual depicted in the composite drawing.

Clegg promptly went to the back of the store and telephoned Mall Security and Agent Allison. Clegg then returned to the cashier's counter where Meador took a $20 bill and 42 cents from defendant in payment for a book selected by him. Meador gave defendant his change and placed the $20 bill in a drawer by the cash register.

After defendant left the store, the women continued to watch him until Lt. Ronald Duffin from Mall Security took up surveillance at the point where defendant appeared about to leave the mall through the east exit. Apparently defendant became aware of Duffin's presence because he veered from that exit toward the central mall.

In the meantime, Allison had determined that the note Meador received from defendant was indeed counterfeit, whereupon he immediately radioed Duffin to take defendant into custody. Allison joined Duffin outside the mall as defendant was being placed under arrest. After advising defendant of his constitutional rights, Allison searched DeBardeleben and found a .22 caliber revolver in his right front pocket, thirteen counterfeit $20 bills, a collection of car keys and a North Carolina driver's license in the name of Roger Collin Blanchard with a North Carolina address. When asked by Allison whether he had a car in the area, defendant declined to answer, and the officers did not pursue it further.

Later that evening after defendant had been taken into custody, Allison gave the car keys found in defendant's possession to Secret Service Agent James Burch, who reasoned that if defendant had a car it would probably be on the east side of the mall where defendant had originally headed after the book purchase. Burch went to the mall parking area near the east exit that night after the mall had closed and observed three parked cars. One of these cars was a 1971 Chrysler bearing a Tennessee license plate. After promptly checking with the Tennessee Highway Patrol, Burch found that there was no record of any such license plate on file at that time. One of the sets of keys taken from defendant be-

longed to a Chrysler automobile, one for the door and one for the trunk. (Another set was for a General Motors make car and such a car was parked in this same area.) Burch took one of the Chrysler keys and inserted it into the lock on the passenger side door of the Chrysler. The key operated the door lock, whereupon Burch re-locked the door, without ever opening it. Burch then fit the other key into the trunk of the Chrysler. This caused the trunk lid to spring open and a trunk light to turn on. Burch then observed what appeared to be a blue bag; but he closed the trunk without examining its content or any other item in the trunk. Burch and other agents then applied to the United States Magistrate for a federal search warrant, which issued the next morning. Before the agents applied for the warrant, they determined that the Chrysler in question was registered to James Richard Jones in Alexandria, Virginia, and that the license plate on the car was from Williamson County, Tennessee, some two hundred miles away, where it had been reported lost or stolen by its owner in October, 1982.

During the search under the warrant of the passenger compartment of the Chrysler, Allison found over two hundred $20 counterfeit bills, driver's licenses from five states bearing defendant's photograph (each bearing a different name and address), Vermont driver's licenses with no photograph but bearing names used by defendant on Alabama and Texas licenses, twenty license plates from 14 different states (some had magnets rather than bolts on the back of the plate, as did the Tennessee plate on defendant's car), a fully loaded semi-automatic pistol, a leather bag containing a photograph of defendant identifying him as a member of the "State Police," and a blue light similar to the one sometimes used by police in unmarked cars. Merchandise bearing dated sales receipts were found in the trunk, which had been purchased at the malls in Johnson City and Kingsport.

The trial court relied on *United States v. Williams*, 434 F.2d 681 (5th Cir.1970) and *United States v. Graham*, 391 F.2d 439 (6th Cir.1968) in denying defendant's motion to suppress the evidence obtained from his automobile. In *Graham*, this court held that the opening of a car door for the purpose of locating a serial number by which the car, properly in police custody, could be accurately identified was not a search, and the court in *Williams*, relying on *Graham*, held similarly. These cases are distinguishable from the instant case because they involved automobiles that were in lawful police custody. Defendant contends that these cases only foreshadowed the Supreme Court decision in *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), where it was held that a car in lawful police custody was subject to a complete inventory of its contents without the necessity of obtaining a warrant. But the court in *Williams* made it clear that the opening of the car door to check the serial number was not part of an inventory search but rather a means of identifying that vehicle:

> [W]here there is a legitimate reason to do so, the mere checking of the serial number of an automobile in order more positively to identify it, is not a search within the prohibitions of the Fourth Amendment.

434 F.2d at 684 (quoting *United States v. Johnson*, 413 F.2d 1396 (5th Cir.1969), *aff'd on rehearing en banc*, 431 F.2d 441 (5th Cir.1970)).

■ In the instant case, the police had tried unsuccessfully to identify the Chrysler owner through a license plate check with the Tennessee Highway Patrol. There was therefore a legitimate reason to insert the keys into the Chrysler to see whether they fit in order to identify that automobile as belonging to defendant for purposes of obtaining a search warrant.[1]

---

**1.** Although it might be argued that the agents should have asked the magistrate for a warrant granting permission to insert the keys into the Chrysler, since Agent Burch also had a set of

General Motors keys that had been taken from defendant and there was a General Motors car on the mall lot, it would have been necessary to request permission to try the various keys on

We agree with the reasoning of the dissent in *United States v. Portillo-Reyes*, 529 F.2d 844 (9th Cir.1975), *cert. denied*, 429 U.S. 899, 97 S.Ct. 267, 50 L.Ed.2d 185 (1976), where case holdings such as those in *Graham* and *Williams* were applied to a factual situation that is similar in some respects to the instant one.

In *Portillo-Reyes*, a border patrol search along the United States/Mexican border of an individual named Romero produced three sets of keys, including a set for a Volkswagen. A border patrol agent through past experience knew that a "load" car was generally in the area when individuals had illegally crossed the border. Therefore, the agent took the keys to a housing project parking lot, the area Romero was walking towards when apprehended, with the intention of locating the load car. There were approximately 35 cars in this lot, one was a Volkswagen in which a man was lying on the front seat. The agent knocked on the window and asked the man about his citizenship. The man, named Reyes, replied that he was a citizen of El Salvador, showed the agent his alien registration, and said he was going to Los Angeles. The agent placed him under arrest and then inserted the key into the car lock, opened the door and conducted a search.

Although the majority in *Portillo-Reyes* found that the agent was justified in tapping on the Volkswagen window to ascertain Reyes' identity because he had reasonable ground to suspect that this automobile and Reyes were connected with the illegal entry of Romero, it was held that the agent lacked probable cause to arrest Reyes or to insert the key into the lock.

*Portillo-Reyes* is distinguishable from the instant case because here no search was made after the agent inserted the keys into the Chrysler to determine whether they fit. Consequently, the majority's holding in *Portillo-Reyes* that the insertion of the key into the Volkswagen door constituted the *beginning* of the search has no application in the instant case. To the extent that the majority found that defendant had a reasonable expectation of privacy in the identity of his vehicle, we disagree. A car owner does not have a reasonable expectation of privacy in his identity as the owner of a particular car, as evidenced by state laws universally requiring the display of license plates and license plate and owner registrations. As previously noted, De-Bardeleben's ownership of the vehicle could not be verified through the license plate on the Chrysler because that license plate, stolen, was not on file at the time the agent sought this usual means of identification.

We find compelling in the instant case the reasoning of dissenting Judge Eugene Wright in *Portillo-Reyes:*

The majority opinion acknowledges that the government agents had reasonable ground for a "founded suspicion" that appellant's automobile and its occupant were connected with the illegal entry of the four aliens. This, says the majority, "justified and rendered reasonable the agent's window-tap invasion of Reyes' privacy to ascertain his identity and to ask for an explanation of the suspicious circumstances."

The opinion itself states that "[t]he decisions of this court are replete in establishing the doctrine [that] a 'founded suspicion' to stop for investigatory detention [can be] converted or ripened into a probable cause to arrest or search through the occurrence of after-the-stop facts and incidents." But the opinion then says that the agents lacked probable cause since they had not determined that the key found on Romero fit Portillo-Reyes' car prior to the search. All of this is based on the premise that "the insertion of the key in the door of the

---

two different cars. Defendant suggests that posting a guard at the lot to prevent the possible removal of defendant's car by a cohort pending issuance of a search warrant rather than fitting the keys into the locks of the Chrysler would have been the proper procedure. The police, however, would not have known *which* car belonged to defendant. The police acted reasonably under the circumstances to identify the proper car to search.

Volkswagen to see if it fit constituted the beginning of the search."

No authority is cited in support of this premise. Precedent seems to be to the contrary. In *People v. Carroll*, 12 Ill. App.3d 869, 299 N.E.2d 134 (1973), *cert. denied*, 417 U.S. 972, 94 S.Ct. 3180, 41 L.Ed.2d 1144 (1974), it was held that

> [n]o constitutional right, personal to the defendant, was violated when Officer Tillrock merely inserted the key [into the apartment door accessible from a common hallway] and learned that the tumbler could be turned by it.

299 N.E.2d at 139.

> It would have been a different case had the key been obtained in violation of some constitutional right of the defendant .... Of course, the mere fact that a police officer has lawful possession of a citizen's key does not confer an unlimited license to use it. However, the legitimate interests of proper crime investigation allow what was done in this case.

*Id.* at 140 (citations omitted).

We have held that police may inspect a vehicle for the limited purpose of ascertaining ownership on less than the probable cause needed to conduct a search. *United States v. Brown*, 470 F.2d 1120, 1122 (9th Cir.1972), and that the mere checking of the serial number of an automobile by opening the door does not constitute a search within the prohibitions of the Fourth Amendment. *Cotton v. United States*, 371 F.2d 385, 393 (9th Cir. 1967); *accord, United States v. Johnson*, 413 F.2d 1396, 1400 (5th Cir.1969), *aff'd on rehearing en banc*, 431 F.2d 441 (1970).

> . . . . .

> The insertion of the key into the door of the vehicle was a minimal intrusion, justified by founded suspicion and in furtherance of the legitimate interests of proper crime investigation, and did not constitute a search within the meaning of the Fourth Amendment.

*Id.* at 851–52 (footnote omitted).

In the instant case, the insertion of the keys into the Chrysler was merely a minimal intrusion, justified by a "founded suspicion" and by the legitimate crime investigation. The agent, acting on a reasonable belief that the car belonged to defendant, did not *search* the Chrysler but merely *identified* it as belonging to defendant. Defendant by the use of a stolen license plate prevented the agent from using that method of determining ownership. Under these circumstances, we affirm the district court's denial of defendant's suppression motion.

Defendant also contends on this appeal that the trial court erred in denying defendant's pre-trial motion to suppress certain in-court identifications of defendant. Defendant argues that the photographic array shown to three of the witnesses was impermissibly suggestive because the photograph of defendant had a height chart in the background and depicted defendant's shoulder area.

 Defendant's argument that witness Melissa Cloyd was prejudiced by the array is meritless since Cloyd never made a positive in-court identification of defendant. The purpose behind the prohibition against suggestive photographic arrays is to guard against positive in-court identification impelled by an impermissible and suggestive photograph and photospread. *See, e.g., United States v. Tyler*, 714 F.2d 664, 667 (6th Cir.1983). There was no basis here for finding that a suggestive photograph tainted an in-court identification. There was strong circumstantial evidence corroborating Cloyd's less than positive in-court identification of defendant ("I'm *almost* positive that it is him."). Cloyd testified that she remembered selling a hat to a white male customer on May 24, 1983, that this man gave her a $20.00 bill, and that she gave him back exactly $17.00; a transaction verified by the receipt in the bag containing the hat found in defendant's car.

 Height charts and pose differences in photographs have been held insufficient to render a photographic array impermissibly suggestive, but each case must be con-

sidered on its own facts. *Tyler*, 714 F.2d 664. In assessing whether an array was impermissibly suggestive, we take into account:

> The opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation and the length of time between the crime and confrontation.

*Id.* at 667.

We consider the in-court identifications of defendant by witnesses Kathy Dunbar and Donna Cooper under this standard.

Kathy Dunbar, a Darden store employee, testified that she remembered selling socks to the man who passed her the counterfeit bill because it had been a quiet evening; that she normally knew most of her customers since Darden's was a specialty store; that this man asked for a special type of pants that the store did not have in stock; that he then chose a pair of $3.00 socks; that he gave her a $20 bill and 20 cents for the socks which she put in a Darden's bag; and that she viewed defendant for approximately five minutes. Dunbar gave the police a general description of this customer before viewing the photographic array.

■ Three days after this purchase transaction, Dunbar was shown the photographic array and picked out two photographs, one of whom was defendant. She positively identified defendant at the trial. Although Dunbar did describe defendant as being shorter than he actually is, defendant's counsel did not ask Dunbar if she noticed the height chart behind the defendant in the photograph.[2] On balance, we find that the circumstances surrounding the showing of the photographic array to Dunbar support the reliability of Dunbar's in-court identification of defendant. Moreover, there was strong circumstantial evidence corroborating Dunbar's identifica-

tion: Dunbar identified the socks taken from defendant's Chrysler as the type sold by Darden's, and the receipt on the bag containing the socks confirmed her testimony as to the date that purchase occurred as well as the amount of the purchase.

■ Defendant's contention that Donna Cooper's in-court identification was impermissibly influenced by the photographic array is meritless. Cooper testified that she recognized defendant immediately when he entered her book store on May 24, 1983, because she had the composite drawing of defendant behind her counter at that time. She recalled her 10-minute encounter with defendant in great detail and provided an accurate description of defendant to the police. Further, two or three days after this encounter she immediately identified defendant's photograph in the array as it was being placed in front of her by Agent Burch. These circumstances fully support the reliability of Cooper's in-court identification. We hold that the district did not err in denying defendant's motion to suppress these in-court identifications.

Defendant's final argument is that he was improperly sentenced because the district judge considered information conveyed orally, not contained in the presentence report. At the sentencing hearing, the probation officer and a Secret Service agent told the district court about some cassette tapes found in DeBardeleben's storage locker along with engraving plates, a printing press, and a large number of counterfeit bills. They told the court that on these tapes DeBardeleben's voice was recorded talking about his plans to make enough money counterfeiting to build a safe house with a chamber where he could torture women, and that on some tapes sounds of women being tortured were recorded. The Secret Service agent told the court that DeBardeleben was the prime suspect in several murders, rapes and kidnappings as a result of these tapes.

---

**2.** Defendant's counsel did, however, question witness Cloyd about whether she noticed the

height chart in DeBardeleben's photograph.

The tapes were mentioned in the presentence report. The report, however, indicated only that DeBardeleben was discussing plans to build a safe house to hide his printing press, and contained no mention of torture. It was also stated in the report that DeBardeleben had passed $158,820 in counterfeit bills since released from parole following a prior conviction, and that approximately $500,000 in counterfeit bills had been found in DeBardeleben's storage locker.

DeBardeleben's attorney objected to information concerning the content of the cassette tapes at the sentencing hearing on the ground that he was never informed of these allegations and had no opportunity to investigate or verify them. When DeBardeleben's attorney asked the district court to not consider this information, the court replied: "I'm not going to sentence him for murder, no." The court then heard DeBardeleben deny the charges arising from the tapes. Before pronouncing sentence, the court discussed the defendant's extensive prior record, the extent of his counterfeit operation, his efforts to conceal his identity, the fact that he carried two loaded guns, and his plans to build a safe house for his printing press. The court did not discuss any information not contained in the presentence report. DeBardeleben was then given fifteen-year concurrent sentences on the counterfeiting violations and a five-year consecutive sentence on the firearms violation.

DeBardeleben now argues that giving the sentencing judge such highly prejudicial information without including it in the presentence report or otherwise disclosing it to the defendant before the sentencing hearing unlawfully deprived him of the opportunity to rebut the allegations. He at no time asked for a continuance of the sentencing hearing nor does he suggest what rebuttal he could make other than his blanket denial, which the court had already heard. He does not argue that the information could not have been properly used for sentencing purposes if it had been timely disclosed. As a general rule, a district judge has broad discretion in determining what sentence to impose, and such sentence will not be reviewable on appeal if it is within the statutory limits. *See, e.g., United States v. Barbara,* 683 F.2d 164, 166 (6th Cir.1982). Here, the twenty year sentence imposed by the district judge was well within the statutory limits, which might have been imposed. We find no prejudicial "reliance upon erroneous or improper factors or information in sentencing so as to amount to a gross abuse of discretion." *Id.* at 166. The sentencing hearing record makes it clear that the judge did not consider or rely upon the suspicion of murder in imposing defendant's sentence. Defendant's counterfeiting activities were sufficiently extensive to warrant the sentence imposed. We conclude that there was no abuse of discretion shown by the district judge in the sentencing process.

Accordingly, we AFFIRM the judgment of the district court in all respects.