UNITED STATES of America, Appellee,

v.

James J. LYONS, Defendant, Appellant.

No. 87–1575.

United States Court of Appeals,
First Circuit.

Heard Aug. 1, 1989.
Decided March 13, 1990.

Bernard Grossberg, for defendant, appellant.

Kenneth P. Madden, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., and Margaret E. Curran, Asst. U.S. Atty., Providence, R.I., were on brief, for the U.S.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and WOODLOCK,* District Judge.

TORRUELLA, Circuit Judge.

James Lyons appeals his conviction on eight counts of an indictment arising from the seizure of large quantities of cash, cocaine, weapons and explosives. Most of these items were removed from two storage compartments. Lyons raises four issues as grounds for reversal: (I) that the insertion of a key into the padlock securing one of the storage compartments was an unreasonable search; (II) that his pretrial stipulation of facts was an unknowing and involuntary waiver of his right to cross examine witnesses; (III) that the court erred in failing to appoint counsel to represent him on his post-conviction motion for a new trial; and (IV) that his sentencing hearing was improper.

We consider his contentions seriatim.

I. *The Padlock to Storage Unit # 633*
—A—

Lyons was arrested on April 2, 1986, in Seekonk, Massachusetts, by FBI agents pursuant to an arrest warrant issued September 12, 1985, involving drug trafficking charges. At the time of his arrest, the agents seized the Oldsmobile he had been driving and the suitcase he was carrying.

* Of the District of Massachusetts, sitting by designation.

A search of his person incident to his arrest yielded a collection of six keys, among which were two standard padlock keys with no distinctive markings. The suitcase was searched later that day pursuant to a search warrant and among the items found was a rental agreement in the name of John North from the E–Z Mini Storage Company in Warwick, Rhode Island, ("E–Z/Warwick") for storage compartment # 792.

On April 2, prior to the search of the suitcase—and apparently by means other than knowledge of the compartment # 792 rental agreement[1]—certain FBI agents made their way to E–Z/Warwick. The proprietor at E–Z/Warwick positively identified Lyons from a photograph "as a person being present on the premises." A review of E–Z/Warwick rental records showed that locker # 633 was rented in the name of Larry Gallo, whom the agents understood through informant information to be an associate of Lyons. Based on this information, the agents inserted one of the keys they had seized from Lyons earlier that day into the padlock securing compartment # 633. The key turned the tumbler; the agents then relocked the padlock without opening the compartment, and left the premises to apply for a search warrant. The compartment itself was opened April 3 when a warrant was obtained. The search of the compartment # 633 yielded a cache of cocaine and weapons.

On April 4, the automobile Lyons had been driving when arrested was searched pursuant to a search warrant and E–Z/Warwick rental documents for storage unit # 633 in the name of Larry Gallo were seized.

—B—

■ Appellant challenges the insertion of the key into the lock to storage compartment # 633 as a warrantless and unreasonable search. The district court ruled that

the insertion of a key into a lock solely for the purposes of identifying ownership, as in this case, did not constitute a search at all. We agree.

"A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection," *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) because public exposure vitiates any reasonable expectation of privacy. Certainly, whether trying the key in order to identify the lock's owner was a "search" is a tricky question. But even if it was a search, it was a unique form of one which, as in the case of a sniff by a dog, and is not unreasonable because there is no expectation of privacy involved. *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

In *United States v. DeBardeleben*, 740 F.2d 440 (6th Cir.1984), *cert. denied*, 469 U.S. 1028, 105 S.Ct. 448, 83 L.Ed.2d 373 (1984), the defendant was arrested for passing counterfeit currency at a shopping mall. Incident to his arrest, a collection of car keys was seized from the defendant. After the mall closed, agents returned to the parking lot and saw three cars. The license plate for one vehicle was not on file. Using the keys seized from the defendant, the agents were able to unlock the passenger door lock and the trunk lock of the vehicle. The agents immediately locked the passenger door without opening it and closed the trunk without examination of its contents. A warrant to search the vehicle was later obtained. The Sixth Circuit, holding that the agents acted reasonably to identify the proper vehicle to search, *id.*, n. 1, p. 443, said:

In the instant case, the insertion of the keys into the Chrysler was merely a min-

---

**1.** Because of the manner in which the district court resolved the issues, the record does not fully develop the facts relating to how the agents came to make their way to E–Z/Warwick. The record does, however, indicate that the dis-

covery of the storage compartment # 792 rental agreement seized in the suitcase search did not play a role in initially bringing agents to that facility.

imal intrusion, justified by a 'founded suspicion' and by the legitimate crime investigation. The agent, acting on a reasonable belief that the car belonged to defendant, did not *search* the Chrysler but merely *identified* it as belonging to defendant. Defendant by the use of a stolen license plate prevented the agent from using that method of determining ownership.

*Id.* at 445.

In the instant case, the insertion of the key into the padlock was merely a means of identifying a storage unit to which Lyons had access. Just as the vehicle in *DeBardeleben* was not registered to that defendant, the storage unit in this case was not leased in Lyons' name. Just as the contents of the vehicle in *DeBardeleben* were not searched or seized prior to the issuance of the search warrant, neither were the contents of the storage unit searched or seized prior to the issuance of the search warrant.

During the suppression hearing, Lyons testified as follows concerning the storage unit:

Q. Was the area—did that area contain items which were yours?

A. Yes, it did.

Q. Did you expect that that area would be your private area?

A. Yes, I did....

Q. And you wanted to secure what was inside of the bin; is that right?

A. Yes.

Clearly, the padlock was placed on the door to protect the contents of the storage unit. When viewed objectively, it is those contents that are the object of the lessee's

privacy expectations, not the padlock. By placing personal effects inside the storage unit, Lyons manifested an expectation that the *contents* would be free from public view. *See United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1976). We conclude that this course of investigation did not constitute a search. *United States v. Place*, 462 U.S. at 707, 103 S.Ct. at 2644, or at least, not an unreasonable search protected by the Fourth Amendment.

Since we find that the insertion of the key into the padlock was not a search, Lyons argument that the affidavit in support of the search warrant did not establish probable cause because it relied on the allegedly tainted information gathered from the padlock, fails.[2]

## II. *Stipulation of Facts*

Prior to trial, on November 25, 1986, Lyons, his counsel, and the Government signed a stipulation of facts and expressly waived his right to trial by jury. Several days later on December 1, 1986, after a lengthy colloquy between Lyons and the trial judge regarding Lyons' understanding of the stipulation and his various waivers, the trial judge found Lyons "thoroughly competent" and his waiver voluntary. After accepting the waiver, the trial judge inquired whether either party wished to be heard further. Neither the government nor Lyons' counsel requested that opportunity and the trial judge found Lyons guilty on all counts. Lyons made no objection at that time. However, on December 19, 1986, he filed a motion for a new trial in which he contended that because his custodial treatment rendered his "brain [ ...]

**2.** In *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), the Supreme Court held that, absent probable cause, the "plain view" doctrine did not permit police officers to move some stereo components slightly to reveal the serial numbers underneath. *See id.* at 325, 107 S.Ct. at 1153 ("A search is a search, even if it happens to disclose nothing but the bottom of a turntable."). In the present case, defendant argues that the "plain view" doctrine also did not permit the police officers to test defendant's key with the storage look.

We decline to address this issue because we do not rest our holding on the "plain view"

exception to the warrant requirement, nor do we undertake to enlarge the contours of that exception. Instead, we hold that the insertion of a key into a lock, followed by the turning of its tumbler in order to determine the fit, is so minimally intrusive that it does not implicate a reasonable expectation of privacy. *See United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644 (holding that the exposure of defendant's luggage, which was located in a public place, to a trained canine does not constitute a search within the meaning of the Fourth Amendment).

like a marshmallow," his stipulation was not knowing and voluntary.

A review of the colloquy demonstrates that the trial judge made full inquiry concerning the voluntariness of Lyons' choice to submit the case on stipulated facts. This colloquy included (1) a forewarning to the defendant that the court could decide the case on the stipulated facts alone and could find him guilty on that basis and (2) inquiry of defendant's counsel in defendant's presence whether he wished to be heard further.[3]

■ Lyons argues now, however, that the colloquy failed to touch upon the effect of the stipulation on his right to cross examine witnesses and was, therefore, inadequate. He contends that a full blown inquiry under Fed.R.Crim.P. 11(c)(3) was required as a matter of law to determine whether his waiver was voluntary and knowing because his trial by stipulation was equivalent to a plea of guilty. A Rule 11 inquiry is mandated when a defendant by plea does not contest a guilty finding; a court's noncompliance with that mandate can constitute reversible error. *McCarthy v. United States*, 394 U.S. 459, 471–72, 89 S.Ct. 1166, 1173–74, 22 L.Ed.2d 418 (1969); *Mack v. United States*, 635 F.2d 20, 24 (1st Cir.1980).[4] However, Rule 11 does not by its terms apply to circumstances other than formal pleas of guilty or *nolo contendere.*

Trial stipulations can run the gamut from modest accommodations designed to avoid unnecessary consumption of time in resolving minor matters over which there is no true contest to agreements which are the functional equivalent of a guilty plea.[5]

3. The colloquy included the following:
THE COURT: And I'm going to ask you, please—hand this to the Defendant, please. Handing you a document from the file which bears the signature James Lyons on the last page, have you seen that before?
MR. LYONS: Yes.
THE COURT: And is that your signature?
MR. LYONS: Yes.
THE COURT: And did you put that, your signature on that page?
MR. LYONS: Yes.
THE COURT: On the 25th of November?
MR. LYONS: Yes.
THE COURT: Did you read that document before you signed it?
MR. LYONS: Yes.
THE COURT: Did you understand that you were not required to sign it?
MR. LYONS: Yes.
THE COURT: Did you take this action voluntarily?
MR. LYONS: Yes.
THE COURT: Do you understand that on the basis of that statement that I could decide this case and could find you guilty of all the charges contained in the indictment?
MR. LYONS: Yes.
THE COURT: Did you have that understanding before you signed it?
MR. LYONS: Yes.
[...]
THE COURT: I'm going to enter this stipulation. Counsel wish to be heard?
[...]
THE COURT: Does this stipulation contain facts upon which the Defendant must be found guilty on all counts of the indictment?
MR. MADDEN: Yes, your Honor.
THE COURT: Do you wish to be heard, Mr. Egbert?

MR. EGBERT: I do not, your Honor.

4. The addition of Fed.R.Crim.P. 11(h) in 1983, which provides that "[a]ny variance from the procedures required by this rule which does not affect substantial rights shall be disregarded," put in question the *per se* reversible error standard articulated in *McCarthy* and *Mack*. *United States v. Goldberg*, 862 F.2d 101, 106 (6th Cir. 1988).

5. The need for the use of trial by stipulation in order to preserve appellate issues has been diminished as a result of the 1983 amendment to Rule 11, which now permits a conditional plea of guilty. The new conditional plea provision, Fed.R.Crim.P. 11(a)(2) allows a defendant to reserve the right to appeal an adverse determination of a pre-trial motion and permits the defendant to withdraw his plea if he prevails on appeal. Rule 11(a)(2) requires the approval of the court and the consent of the government before a conditional plea can be entered. The record does not disclose whether the conditional plea avenue was explored by the defendant here. Even after the adoption of Rule 11(a)(2), however, there remain a number of reasons why trial by stipulation would be used rather than conditional plea: for example, the necessary approval and consent of the court and the government may not be forthcoming; the defendant may be seeking to preserve for appeal a question of sufficiency of evidence rather than merely a pre-trial ruling issue; the defendant may wish to demonstrate some degree of acceptance of responsibility as a mitigating factor at sentencing by agreeing to steps which minimize the consumption of time in the disposition of his case; or the defendant may be interested in controlling the evidence regarding his actions

Justice Harlan marked this spectrum as encompassing, on the one hand, an "agreement between ... counsel and the trial court ... involv[ing] no more than a matter of trial procedure" to, on the other hand, the structuring of a proceeding "involv[ing] so significant a surrender of the rights normally incident to a trial that it amounted almost to a plea of guilty or *nolo contendere*." *Brookhart v. Janis*, 384 U.S. 1, 8–9, 86 S.Ct. 1245, 1249, 16 L.Ed.2d 314 (1966) (separate opinion of Harlan, J.).

We have not had occasion to decide whether, when, or to what degree a trial stipulation must be accompanied by the full panoply of advices required under Rule 11 for a guilty plea. Other circuits, however, have been reluctant to mandate a complete Rule 11 inquiry when faced with a pretrial stipulation even if that stipulation contains all the facts necessary for a determination of guilt. *See, e.g., United States v. Schmidt*, 760 F.2d 828, 834–35 (7th Cir.), *cert. denied*, 474 U.S. 827, 106 S.Ct. 86, 88 L.Ed.2d 71 (1985); *United States v. Schuster*, 734 F.2d 424 (9th Cir.), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 965 (1984); *United States v. Robertson*, 698 F.2d 703, 707–09 (5th Cir.1983); *United States v. Stalder*, 696 F.2d 59 (8th Cir. 1982); *United States v. Lawson*, 682 F.2d 1012 (D.C.Cir.1982); *Witherspoon v. United States*, 633 F.2d 1247 (6th Cir.1980), *cert. denied*, 450 U.S. 933, 101 S.Ct. 1396, 67 L.Ed.2d 367 (1981). *See generally Annotation: Standards of Rule 11 of Federal Rules of Criminal Procedure, Requiring Personal Advice to Accused From Court Before Acceptance of Guilty Plea, As Applicable Where Accused's Stipulation or Testimony Allegedly Amounts to Guilty Plea*, 53 A.L.R.FED. 919 (1981 & 1989 Supp.).

▇ We too decline to extend Rule 11 to cover trial by stipulation. The proper approach, and the one we adopt, is that first articulated by the District of Columbia Circuit in *United States v. Strother*, 578 F.2d 397, 404 (D.C.Cir.1978):

which the trial judge evaluates in order to limit the judge's exposure to aggravating circumstanc-

[W]aiver of jury trial in this context is freighted with what is perhaps more than ordinary significance, and the trial judge should arguably be at some special pains to satisfy himself that the defendant is fully informed about precisely what it is that he is giving up. One way of doing that would be to take heed of at least some of the advices enumerated in Rule 11(c) ... [to] impress[ ] upon defendant the significance of the choice he has purportedly made.

We thus look to the record in this case to determine whether the district judge took "special pains to satisfy himself" that the waiver was knowing and voluntary to impress upon the defendant the significance of the choice to proceed by stipulation. Here, as the partial colloquy set forth in note 4 *supra* illustrates, the district judge made extensive and pertinent inquiry of Lyons prior to accepting the stipulation, and the record demonstrates that Lyons satisfied the judge that he understood the nature and scope of his stipulation. *Cf. Brookhart v. Janis*, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (defendant did not knowingly waive rights when he kept insisting he was not making equivalent of guilty plea). Lyons' belated complaint regarding the stipulation seems wholly contrived to relieve him of the consequences of his decision. The record fully supports the trial judge's finding on the defendant's motion for a new trial that Lyons

was thoroughly competent to make the decision that he did and that he took the action voluntarily ... [The] Defendant knew and understood the proceedings against him and he possessed the ability to consult with his lawyer with a reasonable degree of rational understanding. His present protestations are obviously the result of afterthought and the hope that somehow his present predicament can be improved. The Defendant's responses demonstrate clearly that his "marshmallow' analogy lacks an essential ingredient, that of truth.

es which may be developed more vividly during live testimony at a full trial.

Of course, there is no harm in conducting a complete Rule 11 inquiry particularly when a trial stipulation contains all the facts necessary for a guilty finding. But that particular form of inquiry is not mandated so long as the trial judge conducts a colloquy with the defendant sufficient to demonstrate that the defendant has executed the stipulation freely with knowledge of the consequences of what he is doing. We hold that the trial judge's inquiry here to determine whether Lyons' stipulation was knowing and voluntary was fully sufficient and find no extraordinary circumstances to justify permitting the defendant to withdraw the considered decision he made with the advice of counsel regarding the manner of proceeding on the charges against him.

### III. *Appointment of Counsel on the New Trial Motion*

 After his conviction, Lyons moved *pro se* for appointment of new counsel under 18 U.S.C. § 3006A. Lyons' counsel at the time filed a motion to withdraw which the district court refused to allow until new counsel filed an appearance. At a hearing on the motion for appointment of new counsel, Lyons filed an affidavit of indigency which the Government contested, pointing to a claim filed by Lyons in response to a forfeiture complaint with respect to $318,000 that had been seized in connection with his arrest. Lyons was called to substantiate the affidavit through testimony and he invoked his fifth amendment privilege. In denying the § 3006A motion, the district court observed that Lyons had had appointed counsel at the beginning of the proceedings against him but had later elected to retain private counsel instead, thereby suggesting he was not indigent.

The district court ruled that while Lyons had the right to invoke the Fifth Amendment, that privilege could not "be used as a shield to avoid disclosure of assets." *Cf. United States v. Krzyske*, 836 F.2d 1013, 1018–19 (6th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 89, 102 L.Ed.2d 65 (1988) (defendant cannot decline to present additional information about indigency when any conflict with fifth amendment "is speculative and prospective only"). The district court thereafter denied the Motion to Proceed *in forma pauperis* on March 27, 1987. The district court then took up the motion for a new trial at a hearing on May 11, 1987, at which the attorneys previously retained by Lyons appeared. In a comprehensive Opinion issued June 17, 1987, the trial judge denied Lyons' motion for a new trial.[6]

The dispute over Lyons' right to proceed *in forma pauperis* was reignited in connection with his appeal. Upon Lyons' motion to proceed *in forma pauperis* on appeal, the trial judge ordered appellant's private counsel to disclose their fee arrangement, an order which appellant attempted unsuccessfully to have reviewed in this court. Once the fee arrangement had been disclosed, the district court denied the *in forma pauperis* application on appeal and ordered counsel to remit $7,000 to Lyons so that he might hire new counsel to represent him on appeal.

In prior proceedings in this case, we held that the district court has "jurisdiction to make inquiries which are necessary and relevant to an evaluation of a party's alleged inability to pay," *In re James Lyons*, No. 87–8042, (1st Cir. Sept. 10, 1987) at 2. This is a determination that will "not be lightly overturned." *United States v. Harris*, 707 F.2d 653, 660 (2d Cir.), *cert. denied*, 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 688 (1983).

---

**6.** Appellant also argues that the Government's failure to hold him in a facility closer to Rhode Island and his repeated transfers denied him effective assistance of counsel before trial. This contention is without merit. We agree with the district judge that appellant's reliance on *Cobb v. Aytch*, 643 F.2d 946 (3rd Cir.1981), is misplaced. *Cobb* was premised on a finding that the relationship between the pretrial detainees and their counsel had been prejudiced by their transfers, *id.*, an element entirely missing from this case. In fact, as the trial judge below stated, there was "absolutely nothing to show that the assistance rendered to the defendant by counsel was less than professionally competent." Appellant's motion for new trial was correctly denied on the merits.

Deference to the district court is especially appropriate in this area. The opportunities are manifest for disappointed defendants to manipulate the timing of proceedings and to open new fronts for attack on previous rulings by efforts to discharge counsel and seek new counsel. It is perhaps a testament to the high regard in which attorneys available for appointment under the Criminal Justice Act are held that claims of indigency are used to assist in this manipulation. The trial judge is in the best position to evaluate whether the desire for new and appointed counsel is well founded. We recognize, of course, the need to assure that the right to counsel not be infringed. But "the important right to counsel of choice is not absolute; it must be balanced against the court's authority to control its own docket, and a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." *Krzyske,* 836 F.2d at 1013. Restraints on periodic efforts to change counsel are necessary to ensure that the "right [to counsel] is not manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." *United States v. Allen,* 789 F.2d 90, 92 n. 4 (1st Cir.1986).

The district court's rulings on the *in forma pauperis* issue as it relates to appeal have already been affirmed by this court. *United States v. Lyons,* No. 87–1575, slip op. (1st Cir. Nov. 24, 1987) (concurring in denial of appellant's motion to proceed *in forma pauperis* and affirming the $7,000 refund). We similarly affirm the district court's earlier resolution of Lyons' *in forma pauperis* request as it related to the motion for a new trial.

## IV. *The Sentencing Hearing*

### A. Matters Considered

■ At his sentencing hearing, appellant objected to a paragraph in his presentence report which stated that he intended to bomb state police barracks in Rhode Island. Upon that objection the sentencing judge was required to make a finding of fact as to the allegation of inaccuracy, or alterna-

tively to determine that no finding was necessary because "the matter controverted w[ould] not be taken into account in sentencing." Fed.R.Crim.P. 32(c)(3)(D). The judge was further required to append a written record of his finding or determination to the presentence report. *Id.*

In this case, the district judge merely made a note in the presentence report that appellant denied the bombing plan. This did not meet the requirements of Rule 32(c)(3)(D).

■ Because it is unclear whether the challenged information affected the nature or length of the sentence imposed on appellant, remand is necessary on that issue. *See generally United States v. López-Peña,* No. 87–2003, slip op. at 17 (1st Cir. Nov. 22, 1989). *United States v. Levy,* 870 F.2d 37, 39 (1st Cir.1989); *United States v. Jiménez-Rivera,* 842 F.2d 545, 551–52 (1st Cir.), *cert. denied,* 487 U.S. 1223, 108 S.Ct. 2882, 101 L.Ed.2d 917 (1988); *United States v. Serino,* 835 F.2d 924, 932 (1st Cir.1987). We do not order a new sentencing hearing at this time. If on remand the district court indicates it did not rely on the disputed information, it will make that determination in writing and append it to the presentence report. *Jiménez-Rivera,* 842 F.2d at 552. If the court did rely on the information, however, it will "vacate the sentence and hold a new sentencing hearing" in compliance with the rule. *Id.*

### B. Conduct of Hearing

■ Appellant also challenges his sentencing hearing on grounds he was denied his rights to counsel and to present mitigating evidence. Appellant's contentions are meritless. Not only was he represented by counsel who spoke on his behalf, but his counsel (Edward J. Romano) spoke vigorously and pointedly—notwithstanding the reluctance he expressed at the beginning of the hearing to continue to represent appellant pending disposition of his motion to withdraw as counsel. Appellant has failed to overcome the heavy presumption of adequate representation articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), nor has

he shown any prejudice resulting from his counsel's alleged inadequacy. *Id.* at 693, 104 S.Ct. at 2067.

■ Similarly, appellant's contention that he was denied the opportunity to present mitigating evidence does not withstand scrutiny. Mr. Romano addressed the court at length regarding appellant's troubled childhood and background. Appellant has set forth no other factors he would have presented to mitigate the outcome.

*Affirmed, but remanded for action consistent with Part IV–A above.*

WOODLOCK, District Judge (dissenting).

It is tempting to treat the mere turning of the key to the padlock for storage compartment # 633 as an investigative step not rising to the level of Fourth Amendment concern. That, in essence, is the way the district court treated this step when it ruled that the insertion of a key into a lock solely for purposes of identifying ownership did not constitute a search at all.

Such a treatment, however, creates significant conceptual difficulties, as the majority recognizes with its candid observation that "whether trying the key in order to identify the lock's owner was a 'search' is a tricky question." *Ante,* at 212. The conceptual trick can be avoided, I believe, by adherence to recent Supreme Court precedent.

In *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), the Supreme Court focused Fourth Amendment concerns in this context on whether the investigative step at issue involves the physical exploration and manipulation of the concealed aspects of an object only the exterior of which is exposed. The investigative step here involved just such exploration and manipulation. *Hicks* compels the conclusion that the investigative step at issue in this case was a search for which a warrant was a necessary precondition.

Accordingly, while I join in parts I.A., II, III and IV of the majority opinion, I respectfully dissent from part I.B. and write separately to set forth the bases for my view that this case should be remanded to the district court for further proceedings on the Fourth Amendment issue.

## I

*Hicks,* an opinion handed down after the trial judge's ruling in this case and thus unavailable to him for guidance, is the current touchstone for this area of Fourth Amendment law. In *Hicks* the Supreme Court held that the mere act of moving some stereo components slightly—to reveal the serial numbers underneath—constituted a search. In the words of the Supreme Court, "A search is a search, even if it happens to disclose nothing but the bottom of a turntable." *Id.* at 325, 107 S.Ct. at 1153.

However, here the majority of this court holds that an intrusion into a padlock which merely discloses whether a particular key can open the mechanism is not a search. The majority offers an alternative holding as well: that "even if it was a search, it was ... not unreasonable because there is no expectation of privacy involved." *Ante,* at 212. The Supreme Court in *Hicks* declined to accept either of the two alternative rationales the majority articulates for avoiding the warrant requirement of the Fourth Amendment.

The Court rejected Justice O'Connor's characterization of the officers' actions as a "cursory inspection," not implicating a "full blown search." *See id.* at 333, 107 S.Ct. at 1157 (O'Connor, J., dissenting). Justice O'Connor's characterization is paralleled by the lower court holding and the first alternative ground adopted by the majority in this case. The Court also rejected Justice Powell's suggestion—paralleled by the second alternative adopted by the majority—that a modest dislocation of an object in plain view would be reasonable under the Fourth Amendment. *See id.* at 330, 107 S.Ct. at 1155 (Powell, J., dissenting). The Court instead found that "the 'distinction between "looking" at a suspicious object in plain view and "moving" it even a few inches' is much more than trivial for purposes of the Fourth Amendment." *Id.* at 325, 107 S.Ct. at 1153 (quot-

ing dissent of Powell, J., at 333, 107 S.Ct. at 1157).

The padlock at issue here—no less than the stereo component in *Hicks*—was an "effect" within the meaning of the Fourth Amendment and Lyons had a legitimate expectation of privacy regarding it. While the primary expectation of privacy was attached to the storage compartment itself, the lock was an indefeasible component of that compartment: without a secure lock, the expectation of privacy in the compartment would be significantly diminished. Moreover, Lyons had a reasonable expectation of privacy in the use of the lock itself. It was his private lock; he held the only keys and there was no master key on file. The internal mechanism of the lock was not exposed to outside view; the nature of a padlock is such that it is meant to remain closed unless opened by a person authorized by the owner to make use of the key. Lyons had taken all steps necessary to secure a reasonable expectation of privacy in his identity as the owner of the lock with access to the compartment. It parses too fine to distinguish between a reasonable expectation of privacy in the objects and places a lock secures and a reasonable expectation of privacy in the lock's interior mechanism.

I need not resort to elaborate metaphor to evoke the fundamental function of lock and key to guard those effects which persons seek to keep private. Indeed, the use of a lock is a classic sign that an expectation of privacy legitimately attends the location of a person's effects. "No less than one who locks the doors of his home against intruders, one who safeguards his possessions [by locking them in a private storage compartment] is due the protection of the Fourth Amendment Warrant Clause." *United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1977). Society considers the objects a person seeks to keep under lock and key to be at the very heart of the class of effects for which an expectation of privacy is reasonable. The penetration and manipulation—cursory or sustained, modest or substantial—of the guardian mechanisms of that heartland is no trivial matter for

Fourth Amendment purposes. It is a search in its own right irrespective of whether, as here, it also provides evidence supporting—and is thus the initial stage of—the search of the compartment whose privacy the mechanism guards.

Following *Hicks*, I would conclude that attempting to identify ownership of a private storage compartment by means of the penetration and manipulation of a padlock constitutes a search requiring a warrant unless there is an "acceptable reason for bypassing the usual constraints of the fourth amendment." *United States v. Curzi*, 867 F.2d 36, 41 (1st Cir.1989). I can find none.

I recognize, as the Supreme Court observed last term, that "the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Skinner v. Railway Labor Executives Ass'n.*, —— U.S. ——, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989). The reasonableness of a search "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)). But "[i]n most criminal cases[,] this balance [is struck] in favor of the procedures described by the Warrant Clause of the Fourth Amendment." *Id.* Thus, "[e]xcept in certain well-defined circumstances, a search or seizure in such a case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause." *Id.* The exceptions arise "when special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable." *Id.* (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3167, 97 L.Ed.2d 709 (1987) (citation omitted)). Here there is neither a special need nor a showing that the requirements of the Warrant Clause are impracticable.

In affirming the district court's decision, the majority relies upon case law which has melded the definition of a search with a perceived special need of law enforcement personnel to use keys to discover the identi-

ty of the ownership of certain locked premises and effects.

Thus, the majority suggests that appellant's legitimate expectation of privacy was merely in the contents of the compartment and not in the lock itself or in the identity of those with access to the compartment. Concluding that the sole and limited purpose of the Government in inserting the key in the padlock was to ascertain whether Lyons had access to the compartment, the majority looks to *United States v. DeBardeleben,* 740 F.2d 440, 444–45 (6th Cir.) (no reasonable expectation of privacy in identity of vehicle, thus permissible to insert key in lock to determine ownership), *cert. denied,* 469 U.S. 1028, 105 S.Ct. 448, 83 L.Ed.2d 373 (1984), one of several cases cited by the Government which can be characterized broadly as holding that while there may be a reasonable expectation of privacy in an object, there is not necessarily a privacy interest in the identity of the owner of that object. *See also, New York v. Class,* 475 U.S. 106, 114, 106 S.Ct. 960, 966, 89 L.Ed.2d 81 (1986) (no reasonable expectation of privacy in vehicle identification number (VIN), thus covering VIN with papers not enough to create such an expectation); *United States v. Grandstaff,* 813 F.2d 1353, 1358 (9th Cir.) (inserting key in car door constituted search, but search was reasonable because agents sought only to learn identity of owner, and there is little or no expectation of privacy in the identity of a vehicle's ownership), *cert. denied,* 484 U.S. 837, 108 S.Ct. 119, 98 L.Ed.2d 78 (1987); *United States v. Portillo–Reyes,* 529 F.2d 844, 852 (9th Cir.1975) (Wright, J., dissenting) (inspection by insertion of key into car door for limited purpose of ascertaining ownership does not constitute the beginning of search), *cert. denied,* 429 U.S. 899, 97 S.Ct. 267, 50 L.Ed.2d 185 (1976); *see also People v. Carroll,* 12 Ill.App.3d 869, 299 N.E.2d 134, 139 (1973) (no privacy

interest infringed when officer merely inserted key into apartment door accessible from common hallway and discovered key turned tumbler), *cert. denied,* 417 U.S. 972, 94 S.Ct. 3180, 41 L.Ed.2d 1144 (1974).

All these cases, including *DeBardeleben,* were decided before *Hicks* and accordingly do not reflect the *Hicks* analysis. Moreover, with the exception of the Illinois Appellate Court decision in *People v. Carroll,* the limited analysis of which I find unpersuasive and decline to follow, these cases deal with attempts to identify ownership of automobiles.[1] They rest on the proposition that the expectation of privacy in an automobile is substantially reduced. That proposition is, by now, well established. *See generally New York v. Class,* 475 U.S. at 112–14, 106 S.Ct. at 965–66 (licensed motor vehicles subject to pervasive state regulation, and have range of physical characteristics—such as mobility and visibility—different from fixed dwellings; expectation of privacy therefore reduced); *California v. Carney,* 471 U.S. 386, 392, 105 S.Ct. 2066, 2069, 85 L.Ed.2d 406 (1985) ("pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a magistrate....").

Special characteristics justify recognition of a lesser expectation of privacy in automobiles (and by extension, in automobile locks which are integral parts of the vehicles): their inherent mobility, their intended function (to transport rather than store things), their visibility on the public highway, and their regulable nature. *See generally United States v. Chadwick,* 433 U.S. at 12–13, 97 S.Ct. at 2484–85. More specifically "[a] car owner does not have a reasonable expectation of privacy in his identity as the owner of a particular car, as

---

1. I note that this court was presented with—but did not resolve—a similar situation outside the automobile context in *United States v. Aguirre,* 839 F.2d 854 (1st Cir.1988). There one of the searches under consideration flowed from the placement of a key into an apartment lock to determine whether that key fit. When the agent there found the key did fit the lock, he apparent-

ly did not actually enter, open the door or peer into the apartment. A warrant was thereafter sought and obtained from the magistrate. *Id.* at 856 & n. 2. We declined, however, to consider whether the search in *Aguirre* was improper because the defendant lacked standing to challenge the search. *Id.* at 859–60.

evidenced by state laws requiring the display of license plates and license plate and owner registrations." *United States v. De-Bardeleben*, 740 F.2d at 444. Those characteristics are not present in the case of an immobile storage unit requiring no state licensing and registration or of a padlock obtained for the purpose of securing that unit.[2]

To be sure, the Supreme Court has treated some intrusions as so minimal as not to constitute a search at all. In *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), as the majority notes, the Supreme Court upheld a canine sniff of the outside of luggage at an airport. But the Court in *Place* was careful to emphasize the narrow reach of its holding:

In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—expo-

sure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search....'

*Id.* at 707, 103 S.Ct. at 2644–45.

In *Hicks*, the Court distinguished the type of procedure involved in *Place* from impermissible conduct by noting that the canine sniff was "minimally intrusive and operational necessities render[ed] it the only practicable means of detecting certain types of crime." 480 U.S. at 327, 107 S.Ct. at 1154. The investigative procedure here is not minimally intrusive and there is no special operational necessity to justify it.[3]

Moreover, the canine snout in *Place* was not used to penetrate the interior of the luggage and insinuate itself among the articles within that were otherwise shielded from observation. In short, the deployment of the dog's nose along the unconcealed exterior of the luggage in *Place* and the use of the keys here to penetrate and manipulate the interior of the lock are substantially different physical acts which can hardly be classified as part of the same genus of investigative activity.[4]

---

2. There have been cases in non-automobile contexts in which the Supreme Court has found a subjective expectation of privacy insufficient to justify Fourth Amendment protection against intrusion. For example, a person's construction of a fence around a marijuana patch in the "hope" it will remain unobserved is different from "a subjective expectation of privacy from *all* observations of his backyard." *California v. Ciraolo*, 476 U.S. 207, 212, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986) (emphasis in original). Because the ten foot fence in *Ciraolo* did not protect against the "eyes of a citizen or a policeman perched on the top of a truck or a two-level bus," *id.* at 211, 106 S.Ct. at 1811, it did not protect against the eyes of a policeman flying overhead in public space from which the patch was "clearly visible." *Id.* at 213, 106 S.Ct. at 1812. Similarly, the observation of marijuana plants by the naked eye through openings in the roof and sides of a greenhouse from a police surveillance helicopter flying at a height of 400 feet was held last term not to constitute a search. *Florida v. Riley*, — U.S. ——, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989).

By contrast, the internal mechanism of a lock, to which the defendant held the only keys, and which was not "clearly visible" to anyone, is properly the subject of "a subjective expectation of privacy from *all* observations," *California v. Ciraolo*, 476 U.S. at 212, 106 S.Ct. at 1812.

3. Thus, this is not the type of situation that in *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), impelled the Court to rule "[a] chemical field test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy." *Id.* at 123, 104 S.Ct. at 1661. The test could do nothing more than determine whether the powder was cocaine; it could disclose "no other arguably 'private' fact," and therefore, it "compromise[d] no legitimate privacy interest." *Id.* The reasoning in *Jacobsen* hinged on the combination of the nature of the field test performed and the decision by Congress "to treat the interest in 'privately' possessing cocaine as illegitimate." *Id.*

Such reasoning does not apply to the insertion of a key into a lock. Congress has made no policy statements concerning the legitimacy of "'privately' possessing" a padlock; nor was the "test" conducted in this case—the insertion of the key and the manipulation of the lock—designed solely and efficiently to disclose the presence of contraband.

4. While the majority, in its effort to distinguish *Hicks* with *Place*, takes the position that it is not resting its "holding on the 'plain view' exception to the warrant nor ... undertak[ing] to enlarge the contours of that exception," *ante*, at 213 n. 2, it is apparent that the majority's perception of

Even assuming, however, that the investigative procedure may have been, as the majority suggests, minimally intrusive, that characterization does not alter the fact that the procedure involved a penetration and manipulation of the concealed portions of an effect which the owner had taken all necessary steps to shield from public observation. Under the teaching of *Hicks*, it was a search within the meaning of the Fourth Amendment.

Neither the majority nor the Government contends that the course of investigation resulting in the insertion of the key and manipulation of the lock was justified by "a compelling necessity for immediate action as [would] not brook the delay of obtaining a warrant." *Curzi*, 867 F.2d at 41 (citations omitted). Lyons had already been placed under arrest, the delay involved in obtaining a warrant "pose[d no] threat to police or the public safety," *id.* at 42, and there was no *"great* likelihood that evidence w[ould] be destroyed if there [was] a delay until a warrant [could] be obtained." *Id.* (emphasis in original).[5] This was not an exceptional circumstance where "special needs, beyond the normal need for law enforcement, ma[d]e the warrant and probable cause requirement impracticable." *Skinner v. Railway Labor Executives Ass'n*, 109 S.Ct. at 1414 (citations omitted).

Having concluded that the insertion of the key into and manipulation of the internal mechanisms of the lock to storage compartment # 633 constituted an unwarranted search, I must briefly take up the implications of that conclusion in the context of this case.

## II

### –A–

### *Sufficiency of the Affidavit*

Without the fruits of the impermissible search of the padlock—which provided evidence that the key seized from the defendant fit the lock to compartment # 633—the affidavit in support of the warrant failed to establish probable cause to search that compartment. While the Government provides a lengthy list of grounds providing probable cause for believing that the defendant was a drug dealer familiar with firearms who stored his drugs outside his house, only his reputed association with Larry Gallo—who was the nominal renter of compartment # 633 at E–Z/Warwick—and his periodic presence at the E–Z/Warwick facility suggested that Gallo's storage compartment would contain evidence of Lyons' criminal activity. The reputed Gallo/Lyons association evidence was itself not particularly strong. It was described as "source information" which was defined by the government "... as maybe information that comes from FBI files with nothing in the files to show where it originates from or perhaps information that comes from an informant who has no proven reliability." Such information was insufficient to establish a sound reason for entering compartment # 633 as opposed to any other compartment on the premises. *See generally, Illinois v. Gates*, 462 U.S. 213, 230–35, 103 S.Ct. 2317, 2328–31, 76 L.Ed.2d 527 (1983).

---

a diminished expectation of privacy in the padlock's interior stems in large part from the fact that padlock was located in a "public" place. *See id.* (parenthetical to *United States v. Place* emphasizing that the luggage "was located in public place"); *see also ante,* at 212 (asserting that "public exposure vitiates any reasonable expectation of privacy.") The padlock, however, was only partially exposed to the public. The agents here—like the police in *Hicks* who had exigent circumstances to validate their entry in the apartment—may have had authority to observe the padlock's exterior. But by "taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed" aspects of the interior of the padlock, the agents exceeded such authority as they had to observe matters in plain view, *Hicks*, 480 U.S. at 325, 107 S.Ct. at 1152, or, more precisely here, in a "public" place—the common area of the storage facility.

5. Indeed, a warrant was obtained to search the compartment the following afternoon. There was no evidence to suggest that the FBI was sufficiently concerned *with the destruction of* evidence to take steps to ensure its continued vitality in the interim. Had the agents believed exigent circumstances existed, they could have secured the compartment and lock to protect them from any interference pending the issuance of the warrant. *See Place,* 462 U.S. at 701, 103 S.Ct. at 2641.

## –B–
### Alternative Justifications

Because the district court found that the insertion of the key was not a search and that the affidavit demonstrated probable cause given the additional evidence provided by the use of the key, the district court did not have occasion to address two alternative *post-hoc* justifications for the search of the compartment. These are the exceptions from the exclusionary rule for good faith execution of the search and for inevitable discovery of the evidence. *See, e.g., United States v. Leon*, 468 U.S. 897, 924, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984) (good faith exception operates to prevent application of the exclusionary rule upon evidence obtained in objective good faith using a facially valid warrant even if the warrant is subsequently found to have been issued on other than probable cause); *United States v. Silvestri*, 787 F.2d 736, 744 (1st Cir.1986), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988) (outlining concerns to be considered in invoking the inevitable discovery exception to the exclusionary rule); *see generally Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *see also Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 2534, 101 L.Ed.2d 472 (1988) ("The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.") (emphasis in the original).

I would remand to the district court for evaluation of these justifications for the search of compartment # 633.

## III

Sir Walter Scott reports that "[t]he king's keys are, in law phrase, the crow-bars and hammers used to force doors and locks, in execution of the king's warrant." W. Scott, V Waverly Novels, *The Antiquary* 305 n. * (A. Constable & Co. reprint ed. 1895). The majority here has expanded the definition of the king's keys. That definition now is not limited merely to the devices necessary in execution of a warrant. It includes any set of keys available to those capable of executing the sovereign's warrant irrespective of whether they have such a writ. Under the majority's definition, keys can be used without a warrant to explore the concealed interiors of the guardian mechanisms people employ in their efforts to make private those places and things over which they exercise dominion and control.[6]

The analytical device used by the majority to achieve this definitional expansion is to conceive the intrusion at issue here as something less than a search or, if a search, a reasonable one. In *Hicks*, the Supreme Court declined "to send police and judges into a new thicket of Fourth Amendment law, to seek a creature of uncertain description that is neither a plain-view inspection nor yet a 'full-blown search.'" 480 U.S. at 328–29, 107 S.Ct. at 1154. In this case, the agents and the courts have generated that creature by extending the plain-view inspection of the exterior of the padlock into an examination of the lock's concealed interior.

I can find no special need—beyond the normal desire of law enforcement agents to use any tool at their disposal—to justify dispensing with the warrant and probable cause requirements of the Fourth Amendment when agents find themselves in possession of keys during their investigative work. The failure of the agents here to obtain a warrant for the use of the key to penetrate a place the defendant sought to maintain as private calls into question the evidence they later obtained as a result of that action. I would accordingly remand

---

**6.** Elsewhere, Scott describes the efforts made to protect places and effects from use of the king's keys. In *Redgauntlet,* he gives an account of a "door framed to withstand attacks from excisemen, constables, and other personages, considered as worthy to use what are called the King's keys [fn: "In common parlance, a crowbar and hatchet."] 'and therewith to make lockfast places open and patent' ..." W. Scott XVII Waverly Novels, *Redgauntlet* 388–89 (Adam & Charles Black Centenary ed. 1871).

the case to the district court for evaluation of whether the *post-hoc* justifications for the use of evidence obtained on the basis of a faulty search are applicable in this case.