UNITED STATES of America

v.

**Nelson CASTELLANOS, Defendant.**

No. S2 92 Cr. 584 (SS).

United States District Court, S.D. New York.

April 7, 1993.

Roger S. Hayes, U.S. Atty., S.D.N.Y. by Allen D. Applbaum, Steven M. Cohen, for U.S.

Ivan S. Fisher by Kenneth M. Tuccillo, Debra Elisa Cohen, New York City, for Nelson Castellanos.

## MEMORANDUM OPINION AND ORDER

SOTOMAYOR, District Judge.

■ The Fourth Amendment erects around each of us a barrier against governmental intrusion, shielding against "unreasonable searches and seizures" and mandating that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." To deter conduct violative of the Fourth Amendment, and thereby to secure and safeguard the precious rights that it guarantees, courts have developed the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3412, 82 L.Ed.2d 677 (1984), citing *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). The case at bar is not the familiar one where, as in *Leon*, the constable or magistrate merely blundered, thereby permitting admission of otherwise improperly seized evidence, but rather the not-rare-enough one where a law enforcement officer not only flouted the Constitution, but intentionally misled a magistrate into issuing a search warrant that she had initially refused to grant. This type of egregious conduct must be deterred if the Fourth Amendment is to have any meaning.

Following a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978), the Court concludes that false material facts were used to procure a warrant to search Apartment A2 at 200 West 109th Street in Manhattan ("Apt. A2"). The Court is also persuaded by the record that the magistrate would not have issued a warrant absent those deceptions, and therefore defers to the magistrate's own initial disposition of the probable cause inquiry. For these reasons, more fully set out below, the motion of defendant Nelson Castellanos to suppress the evidence seized in connection with the search of Apt. A2 is **GRANTED.**

## I. *Background*

On July 1, 1992, defendant Nelson Castellanos was arrested in the vicinity of 200 West 109th Street and charged with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine. Complaint, Mag.Dkt. No. 92–1324. Late that evening, Detective Stephen Guglielmo, of the New York Drug Enforcement Task Force, went with Assistant United States Attorney ("AUSA") Maxine Pfeffer to the home of Magistrate Judge Barbara A. Lee to obtain a warrant to search Apt. A2. The magistrate initially did not issue the warrant, but only did so after additional facts were inserted into the affidavit signed by Detective Guglielmo. Challenging the veracity of statements contained in that affidavit, defendant moves to suppress the evidence seized as a result of the execution of the warrant.

With the numerous disputed and inconsistent factual details set to one side, a straightforward outline of the relevant facts emerges. Detective Guglielmo was the case agent in charge of the investigation of the defendant. One of the primary goals of his investigation was to determine the "stash location" where defendant's narcotics were stored. He enlisted the assistance of a confidential informant, Jose "Tony" Vega, who began cooperating with the government in December 1991, several months after his own arrest that September. Detective Guglielmo learned from Vega that he had bought cocaine from the defendant inside Apt. A2 on numerous occasions prior to his cooperation with law enforcement authorities. Detective Guglielmo also spoke to the local precinct that had, at some unspecified previous time, received anonymous letters concerning the drug activities at the building at 200 West 109th Street (the "building").

On February 27, 1992, Detective Guglielmo gave Vega $2,300 with which to purchase cocaine from the defendant. Vega and Castellanos met that day in front of 200 West 109th Street, and then entered the building for either a "short time" or "approximately five minutes." What actually happened while they were in the building is the subject of this hearing. There is no dispute among the witnesses, however, that defendant did not

deliver any drugs to Vega inside the building, but instead directed Vega to go outside the building. After Vega left the building, he went to 108th Street and Broadway, a few blocks away, where co-defendant Hector Venicio Soto, also known as Venicio, gave him a Remy Martin box containing 250 grams of cocaine. During the debriefing that followed the transaction, Vega told Detective Guglielmo that he had paid $2,300 for 125 grams of the cocaine, obtaining the rest on credit.

Detective Guglielmo prepared a Drug Enforcement Administration ("DEA") report concerning the events of February 27. The report does not include any information about where Vega and Castellanos had been when they were inside the building. It does not mention Apt. A2, the suspected stash location, in any way. It also does not mention that anyone other than defendant and Vega was inside the building, or that Hector Venicio Soto—who allegedly gave the cocaine to Vega—had been with the defendant inside the building.

Yet, at the *Franks* hearing, Detective Guglielmo testified that he learned from Vega during the February 27 debriefing that Vega and Castellanos had gone up to the second floor of the building and had spoken in front of Apt. A2. They "were going to go into the apartment, but another individual ... Venicio, stated that the block was hot." Detective Castellanos continued his testimony by explaining that in response to the warning that the block was "hot," defendant had directed Vega to pick up the cocaine around the corner. There, Vega met Hector Venicio Soto and obtained the cocaine from him. Out of all of this testimony, only the material in the last sentence was included in the DEA report.

On March 10, 1992, Detective Guglielmo videotaped a second meeting between Vega and the defendant in front of the building. Again, the two entered the building. At the *Franks* hearing, Vega distinctly recalled that on March 10 he remained with the defendant on the staircase to the second floor, adamantly denying that on that day they had approached Apt. A2. Vega also testified that he had only been inside the building twice

with the defendant after he began cooperating with the government—February 27 and March 10. Although he insisted that on one of those two occasions, the defendant approached the door of Apt. A2, keys in hand, Vega would not agree that the approach to the door of Apt. A2 did occur, or had to have occurred, during their February 27 meeting.

On July 1, 1992, Detective Guglielmo and several other agents arrested Castellanos pursuant to an arrest warrant. They searched a white shopping bag that the defendant was carrying and found it to contain approximately $10,000 in cash, which consisted mostly of $1 and $20 bills. They also took custody of defendant's keys, and then went into the building and inserted the keys into the locks on the door of Apt. A2, determining that the keys fit those locks. While they were testing the keys, they heard noise or music coming from within the apartment and entered it to conduct a security sweep.

That evening, Detective Guglielmo and AUSA Pfeffer prepared a search warrant affidavit for Apt. A2 and brought it to Magistrate Judge Lee's home. AUSA Pfeffer has stipulated that she was not told about the security sweep and that the sweep was not disclosed in the affidavit or in conversation with the magistrate. Moreover, after the magistrate reviewed the affidavit, rather than issue a warrant, she asked that additional information be provided with respect to Apt. A2. In response to the magistrate's inquiry, Detective Guglielmo, without AUSA Pfeffer, went into the hallway outside of the magistrate's apartment and contacted Vega by cellular telephone. Detective Guglielmo claims that Vega reminded him of the February 27 approach to Apt. A2. During the *Franks* hearing, however, Vega only recalled telling Detective Guglielmo about the location of a safe inside Apt. A2 and could not recall anything else that he might have said during their telephone conversation.

After he completed his call with Vega, Detective Guglielmo returned to the magistrate's apartment. AUSA Pfeffer inserted into the affidavit by hand the information that Detective Guglielmo represented he had just learned from Vega. This handwritten insert in Paragraph 6 of the affidavit ("hand-

written insertion") relates to the February 27 meeting and reads as follows:

> After agreeing to and receiving payment for the narcotics, Castellanos took out his keys, began to place the keys in the lock of the door to Apt. A2 [Mr. Castellanos] said, in substance and in part, let's go in here. [Vega] has further informed me that [he] understood that Castellanos would deliver the narcotics inside Apartment A2 at that time.

At the hearing, Vega denied telling Detective Guglielmo that the keys had ever been placed in the lock, but he did insist that they had been moving toward the door—although he would not say on what date or during which meeting that had occurred.

Magistrate Judge Lee was again presented with Detective Guglielmo's affidavit, now containing the handwritten insertion. Upon reviewing this modified affidavit, she then issued the requested search warrant.

Castellanos has moved to suppress the evidence that was obtained during the search, attacking the validity of the warrant in light of the questionable veracity of the handwritten insertion. The Court, finding that defendant had made a sufficient preliminary showing to entitle him to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978), held a *Franks* hearing on February 4, 5, and 11, 1993.

## II. *Discussion*

"[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." This Fourth Amendment protection would be "reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile." *Franks v. Delaware*, 438 U.S. 154, 168, 98 S.Ct. 2674, 2682, 57 L.Ed.2d 667 (1978).

A defendant in a criminal proceeding, under certain circumstances, has the right "to challenge the truthfulness of factual statements made in an affidavit" used to obtain a search warrant issued *ex parte.*

*Franks*, 438 U.S. at 155, 98 S.Ct. at 2676. If the defendant's challenge is successful, the suppression of evidence may result, for "a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading information." *U.S. v. Levasseur*, 816 F.2d 37, 43 (2d Cir.1987).

A district court must suppress the evidence obtained during the execution of a search warrant "to the same extent as if probable cause was lacking on the face of the affidavit" if the testimony at a *Franks* hearing persuades the court that two conditions are met. 438 U.S. at 156, 98 S.Ct. at 2676. First, "the allegation of perjury or reckless disregard [for the truth] is established by the defendant by a preponderance of the evidence." *Id.* Second, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Id.* Each requirement is addressed in turn.

### *The Handwritten Insertion*

The first prong of the *Franks* test requires that the affidavit contain information "that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984), citing *Franks*. " 'Reckless disregard for the truth' means failure to heed or to pay attention to facts as [the affiant] knew them to be." *Rivera v. United States*, 728 F.Supp. 250, 258 (S.D.N.Y.1990), *aff'd in relevant part*, 928 F.2d 592 (2d Cir. 1991). Thus, if the affiant "made statements which failed to take account of the facts as he knew them, or which he seriously doubted were true, that would show reckless disregard for the truth." *Id.*

Defendant contends that the handwritten insertion in the warrant affidavit satisfies this element of the *Franks* test. After carefully weighing the testimony at the *Franks* hearing and examining the submissions of the parties regarding these disturbing allegations of a tainted affidavit, the Court must agree with defendant. For the reasons stated below, defendant has estab-

lished by a preponderance of the evidence that Detective Guglielmo either fabricated the material in the handwritten insertion, or, if during the July 1 telephone conversation Vega did indeed make the statements attributed to him, that Detective Guglielmo displayed a reckless disregard for the truth in accepting Vega's comments and including them in his affidavit.

At the outset, the *Franks* hearing raised doubts about Detective Guglielmo's credibility. Shortly after arresting the defendant on July 1 and confiscating his keys, Detective Guglielmo not only tested them in the lock of the door to Apt. A2 but, after hearing some noise or music coming from the apartment, made a warrantless "security sweep" of it. Detective Guglielmo claims that he told AUSA Pfeffer about the warrantless entry before they submitted the warrant application to the magistrate. Yet, the government has stipulated that Detective Guglielmo did not tell AUSA Pfeffer about the sweep and that he did not disclose the sweep to the Government until just before he took the stand in the *Franks* hearing.

Similarly, Detective Guglielmo testified at the hearing to a number of crucial facts that he had purportedly learned from Vega during the February 27 debriefing. He claimed to have learned that Vega and the defendant were going to enter Apt. A2 to effect their drug transaction, but were stopped when Hector Venicio Soto, one of the "guys" who worked for defendant, warned them that they should go elsewhere because the street was "hot." Yet Detective Guglielmo neglected to mention either of these two critical accomplishments in his February 27 DEA report. Although the report did mention that Vega had taken delivery from an individual later identified as Hector Venicio Soto at 108th Street and Broadway, it failed to include any mention that Soto was in the building with the defendant. These omissions are utterly inconsistent with Detective

Guglielmo's claims. Even accepting Detective Guglielmo's testimony that not all pertinent information is included in DEA reports, this Court finds it inconceivable that the detective would exclude such relevant information as putting the drug deliverer, Soto, in the same location as the defendant, the suspected drug supplier, and placing both in the immediate vicinity of the suspected stash apartment. Not only the DEA report but also the affidavit originally proffered to the magistrate omitted these crucial items.[1]

Vega's testimony is inconsistent with that of Detective Guglielmo in several respects, and the inconsistencies are troubling. The most disturbing aspect of Vega's testimony was his refusal to identify his February 27 meeting with the defendant as the date that the defendant, wielding his keys, purportedly approached Apt. A2. Vega stated numerous times that he only met with the defendant twice during the investigation, and adamantly denied that they had approached Apt. A2 during their second meeting, on March 10. Yet, as though fearing a trap, he would not agree that the episode occurred on February 27—the logical consequence of his own testimony. In this regard it is significant that Vega remembered making out a written statement to Detective Guglielmo after the February 27 meeting and that, not surprisingly, the statement did not include any information about Apt. A2 or Soto's or anyone else's presence in the building.

It is equally significant that Vega only testified that an unidentified person had come in from the outside and warned him and the defendant that the street was "hot." This is incompatible with Detective Guglielmo's testimony that Vega had identified Soto as the one inside the building who had issued the warning, and with his testimony that Vega and the defendant were the only two people to enter and exit the building while he was observing it.

1. Another suspicious omission in Detective Guglielmo's affidavit is his failure to advise the magistrate that he had learned that one "Rosa Soto" was registered with Con Edison to Apt. A2, but that a fifth floor apartment was registered to defendant's wife, Judelka Soto Castellanos, and another apartment on the second floor was registered to another Soto. Indeed, despite this knowledge, Detective Guglielmo had testified at one grand jury presentation that Apt. A2 was registered to the defendant's wife. His willingness to testify to this assumption, in light of all of the information that he had, is but one of many incidents that brings his veracity in question.

It is also noteworthy that Detective Guglielmo would add to his affidavit the material concerning the keys only after he had his July 1 conversation with Vega. Yet, Vega only remembered that they had discussed a safe in Apt. A2, but could not remember discussing anything else.

Finally, Vega's testimony about what had happened with the keys also deviates from the scenario included in the handwritten insertion. The handwritten insertion states that the defendant "took out his keys, [and] began to place the keys in the lock of the door to Apt. A2." At the hearing, Detective Guglielmo testified that Vega had told him that the keys were in the door, but Vega testified only that the defendant was "going towards the door," which Vega knew he was "about to open" because he "had keys in his hand." Vega did not testify, as Detective Guglielmo claimed, that when they were on the second floor landing in the building, the defendant had "said, in substance and in part, let's go in here." Nor did Vega testify that he "understood that Castellanos would deliver the narcotics inside Apartment A2 at that time." In short, Vega never testified to any of the items about which the handwritten insertion purports to quote him—expanding this Court's already substantial doubt that Vega told the detective, either on February 27 or on July 1, what the detective says he was told.

If on July 1 Vega did communicate to Detective Guglielmo the information that he incorporated in the handwritten insertion, Detective Guglielmo's judgment in accepting these statements was reckless. For example, Detective Guglielmo himself did not re-member the details on July 1, thus necessitating the call to Vega. In view of the pivotal role of this information in linking the drug activity and Apt. A2, it is incredible that Detective Guglielmo would have forgotten these details. Given Vega's general demeanor, which suggested a savvy comprehension of what "cooperation" with the government demanded of him, Detective Guglielmo was indifferent to the truth in purportedly relying on Vega's recollection of the facts to refresh his own memory, particularly when the detective testified that he did not see anyone enter the building who could have warned the defendant and Vega, as Vega claimed had happened.[2]

█ It is possible that Vega reported the information contained in the handwritten insertion to Detective Guglielmo during their debriefing on February 27, that the detective omitted it from his DEA report on the debriefing and again from his original submission to Magistrate Lee, and that Vega duly recounted the same information during the July 1 telephone conversation. Mere possibility, however, is not the standard governing the motion at bar. The Court must find only that defendant has demonstrated by a preponderance of the evidence that Detective Guglielmo knew, or, absent a reckless disregard for the truth, would have known, that the handwritten insertion was false. The aforementioned peculiarities and inconsistencies, and the Court's observation of the witnesses who testified at the hearing, convince the Court that the defendant has met this burden,[3] and therefore the Court turns to the second prong of the *Franks* test.

2. The Court discounts the possibility that, in contradiction to his testimony, Detective Guglielmo first learned about the approach to Apt. A2 during his July 1 conversation with Vega. After all, Vega knew and understood that he was a government informant charged with the duty of obtaining and conveying information about drug transactions to Detective Guglielmo. Had he and the defendant approached Apt. A2 as indicated in the handwritten insertion, or been warned by the same person who subsequently delivered the drugs, Vega surely would have recognized the importance of that action and conveyed it to Detective Guglielmo during their February 27 debriefing.

The defendant's motions were accompanied by an affidavit in which the defendant disputes the truthfulness of statements made by Detective Guglielmo and by Vega. The Court is cognizant that defendant's statement that he did not see Vega between February 27, 1992 and May 26 of that year is at odds with the weight of evidence that suggests that they met in March of 1992, particularly the March 10 videotape, which clearly shows Vega and the defendant greeting each other. In evaluating the credibility of other witnesses and in finding the relevant facts, the Court has given the defendant's affidavit the appropriate weight in light of this inconsistency.

3. Consequently, the government's application for a good-faith exception to the suppression of the evidence obtained during the search can be dis-

## The "Untainted" Affidavit

██ The second task confronting a district court after a *Franks* hearing is to examine the affidavit with the false material— herein the handwritten insertion—placed to one side. Typically, this requires a de novo review of the sufficiency of the remaining material to establish probable cause.[4] This

missed at the outset. The good-faith exception to the exclusionary rule does not apply where a warrant affidavit contains statements made with intentional or reckless disregard for their truth. *U.S. v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

4. The sufficiency of the untainted ·affidavit to establish probable cause is a close call. Putting the handwritten insertion to one side, the following items pertaining to Apt. A2 remain:

> (1) Vega stated that on February 27, 1991, in front of the door to Apt. A2, he and "Castellanos discussed the possibility of [Vega] purchasing 125 grams of cocaine and obtaining another 125 grams of cocaine on consignment." Para. 6. Vega paid a sum of money to the defendant, who, "upon hearing ... that there might be law enforcement officers in the area," directed Vega to pick up the cocaine elsewhere. Para. 6.
> (2) Vega advised Detective Guglielmo that "on numerous occasions prior to cooperating with law enforcement authorities, [Vega] obtained large quantities of cocaine from" [the defendant and someone else] inside of" Apt. A2, and that "quantities of cocaine were kept" in Apt. A2. Also, "in the past, Vega ·observed [defendant]. maintain a ledger [in Apt. A2] which contained notations about the distribution of cocaine." Para. 7.
> (3) "Previously, [Vega] had described [Apt. A2 as] a studio apartment." This is consistent with Con Edison records. Para. 9.
> (4) Detective Guglielmo arrested defendant on July 1, 1992, pursuant to an arrest warrant, after observing the defendant leave the building carrying a white shopping bag, which he found to contain $10,000 in primarily small denominations. "At the time of his arrest, [defendant] was also found to be in possession of keys which fit the locks on the door to [Apt. A2]." Para. 11.

The Supreme Court has set forth a "totality-of-the-circumstances" test for determining probable cause to support a search warrant. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." 462 U.S. at 238, 103 S.Ct. at 2332. "'[O]nly the probability, and not a prima facie showing, of criminal activity'" is required to establish probable cause. 462 U.S. at 235, 103 S.Ct. at 2330 (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584,

590, 21 L.Ed.2d 637 (1969)); *see generally United States v. Wagner*, 989 F.2d 69 (2d Cir.1993).

Guided by these principles, the Court is troubled by two aspects of Detective Guglielmo's "untainted" affidavit, both involving how the alleged narcotics activity may be localized to Apt. A2. *First*, Detective Guglielmo knew that the defendant's keys unlocked the door to Apt. A2 only because he had tried the keys in that door after confiscating them from the defendant. It is well settled that information learned from an illegal search cannot form the basis of a search warrant application. *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). There is a distinct possibility that defendant's reasonable expectation of privacy in his door lock was violated when Detective Guglielmo tested the confiscated keys in the lock. There is, however, no clear Second Circuit authority on this subject and such would be essential in assessing the existence of probable cause in this case because that search was central in localizing suspected drug activity to Apt. A2. In this regard, Judge Woodlock's dissent in *U.S. v. Lyons*, 898 F.2d 210, 219 (1st Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990), is provocative. "The penetration and manipulation—cursory or sustained, modest or substantial—of the guardian mechanisms of [locked objects] is no trivial matter for Fourth Amendment purposes." *Id.; but see U.S. v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir.1991) (although "inserting and turning the key" in the lock to an apartment door is a search, since it yields "information [about] the inside of the lock, which is both used frequently by the owner and not open to public view," warrant was not necessary, because search was "reasonable," and "although a warrant may be an essential ingredient of reasonableness much of the time, for less intrusive searches it is not"); *U.S. v. Lyons*, 898 F.2d 210, 213 n. 2 (1st Cir.1990) ("[T]he insertion of a key into a lock, followed by the turning of its tumbler in order to determine the fit, is so minimally intrusive that it does not implicate a reasonable expectation of privacy."). Since the insertion of a key into a lock at least arguably implicates Fourth Amendment concerns, Detective Guglielmo's failure to explain to the magistrate how he had learned that defendant's keys opened Apt. A2 is disturbing. This concern may have been exacerbated had the magistrate been informed that both Vega and Con Edison records had disclosed to the detective that defendant's wife and other members of his family also had other apartments in the building. Therefore, the defendant's exiting of the building with a shopping bag did not necessarily imply that he exited from any apartment in the building, even one to which he carried keys. Had all of this informa-

case is unusual in that the Court need not, and should not, even make a probable cause inquiry because the record unambiguously reflects that Magistrate Judge Lee did not issue the warrant absent the handwritten insertion. When Detective Guglielmo and AUSA Pfeffer presented Magistrate Judge Lee with the warrant affidavit at her home, she did not issue the search warrant and required that they provide additional information linking Apt. A2 with the drug activity. Only after the handwritten insertion was included in the affidavit did she conclude that there was probable cause and issue the warrant.

■ From this sequence of facts, the Court can only conclude that the magistrate had determined that the affidavit originally proffered by Detective Guglielmo and AUSA Pfeffer was insufficient to establish probable cause. Thus, the second prong of the *Franks* test is satisfied, since "[s]uppression [is] an appropriate remedy if the magistrate or judge in issuing a warrant *was misled* by information in an affidavit" that the affiant knew or should have known was false. *U.S. v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984) (explaining that *Franks* survived its decision) (emphasis added). What is relevant, therefore, is the effect of the false material—that of misleading the

magistrate into finding probable cause where otherwise she would not find it.

■ Ordinarily, a district court does not know whether or not the magistrate would have accepted an untainted affidavit or was misled by an affidavit and consequently must conduct its own probable cause inquiry in order to ascertain whether the false material supported the finding of probable cause. The second prong of the *Franks* test must have been premised on this typical uncertainty. In this unusual case, however, the magistrate's own judgment on the untainted affidavit is in the record. The magistrate read the untainted affidavit, was not convinced by it, and did not sign it. As the Supreme Court has stated, "the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." *U.S. v. Leon*, at 914, 104 S.Ct. at 3416, citing *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969). Right, wrong, or otherwise, a magistrate's determination of probable cause must be afforded great deference, *United States v. Nichols*, 912 F.2d 598, 602 (2d Cir.1990), and a district court should not substitute its own probable cause determination on an issue of insufficiency where that of the magistrate is on the record and is clear.

---

tion been disclosed to the magistrate, it might have given her even more pause about issuing the requested warrant.

*Second,* Vega had not been inside Apt. A2 since prior to his arrest on September 5, 1991—almost one year before the warrant's affidavit was submitted to the magistrate. The last contact Vega had had with the defendant was on March 10, almost four months before his July 1 arrest. On that date, no drugs were given to Vega. There is thus a strong question as to whether Vega's experiences obtaining cocaine from the defendant inside Apt. A2, and his observations of a transaction ledger and drug stockpile there, are stale. The Second Circuit recently explained that although "there is no bright line rule for staleness, the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past." *United States v. Wagner,* 989 F.2d 69, 75 (2d Cir.1993). In *Wagner,* the Second Circuit upheld a determination that a search warrant affidavit describing the purchase of four "nickel bags" of marijuana

from a co-defendant in her home six weeks earlier was stale. Nevertheless, staleness may be cured if an affidavit also "establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one-time occurrence." *Id.* Moreover, "[n]arcotics enterprises are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness." *Id.,* quoting *U.S. v. Feola,* 651 F.Supp. 1068, 1090 (S.D.N.Y.1987), *aff'd mem.,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989). Whether or not the affidavit establishes a pattern of continuing criminal activity sufficient to overcome the staleness of the material in the affidavit is a close question which the Court need not resolve at this time. It suffices to say that it is close enough to warrant serious consideration.

Even though it is not necessary to determine whether or not the "untainted" affidavit establishes probable cause, enough troubling issues infect this warrant application that the Court may conclude that, at the very least, a magistrate's decision not to grant a warrant would not have been erroneous.

To reject the magistrate's original determination in a case such as this would reward and encourage deception by giving the government and police multiple bites at the apple. Where a magistrate determined that there was not probable cause, or questioned the sufficiency of facts proffered during a warrant hearing, the applicant would be encouraged to supplement the affidavit with false information that would guarantee the issuance of a warrant. Then, the search will have occurred and the police and government would still have a de novo review of the affidavit. This result would be contrary to the basic tenets expressed by the constitutional requirements for a search warrant. If the court is always to determine de novo whether probable cause exists, even after a magistrate has determined that it does not, then there is no purpose to having a magistrate issue warrants. The police might as well conduct warrantless searches since the magistrate's review would be of no consequence. The good-faith exception in *Leon* was founded on the principle that the government should not be penalized for the good-faith errors of an independent magistrate. This policy, however, demands that the government insure the independence of a magistrate by not benefiting from falsehoods that directly induce a warrant. In short, if the exclusionary rule is to have any meaning, it must be applied in a situation such as this where a magistrate, right or wrong, did not issue a warrant except after a proffer of perjured testimony.

The "alternative sanctions of a perjury prosecution, administrative discipline, contempt or a civil suit are not likely" to repel the "specter of intentional falsification." 438 U.S. at 168–69, 98 S.Ct. at 2682–83. The exclusionary rule's goal of deterrence, coupled with the "solemnity and moment of the magistrate's proceeding," 438 U.S. at 166, 98 S.Ct. at 2682, and the policy of great deference to the magistrate, compel this Court's decision to adopt the magistrate's apparent determination that probable cause was not established absent the handwritten insertion. The Court must therefore suppress the evidence whose seizure directly resulted from the deceit by a law enforcement officer.

## III. *Conclusion*

The Second Circuit recently observed that "the police must be dedicated, in our democratic society, to exercising the authority of their office in a manner that protects the constitutional rights of suspects and encourages respect for the rule of law by its proper enforcement." *U.S. v. Gribben,* 984 F.2d 47, 52 (2d Cir.1993). In light of this important policy, and for the reasons stated above, defendant's motion is GRANTED and the fruits of the search of Apt. A2 shall be suppressed from his trial.

**SO ORDERED.**